# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-2062

_____

Rosebud Sioux Tribe, a federally recognized Indian tribe, and its individual members

*Plaintiff - Appellee*

v.

United States of America; Department of Health and Human Services, an executive department of the United States; Xavier Becerra, Secretary of Health and Human Services; Indian Health Service, an executive agency of the United States; Elizabeth A. Fowler, Director of Indian Health Service; James Driving Hawk, Director of the Great Plains Area Health Service

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of South Dakota - Central

_____

Submitted: March 18, 2021
Filed: August 25, 2021

_____

Before SHEPHERD, ERICKSON, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

In this appeal, we are asked to consider whether the district court[1] erred by declaring the United States has a duty to provide "competent physician-led healthcare" to the Rosebud Sioux Tribe ("the Tribe") and its members. In light of promises made to the Tribe more than 150 years ago, and relevant legislation since that time, we find the district court correctly articulated the existence and scope of the duty and declaratory judgment was proper. We affirm.

## I.    BACKGROUND

### A.    Relevant Law and History

On April 29, 1868, representatives of the United States and "the different bands of the Sioux Nation of Indians" including what is now the Tribe signed the Treaty of Fort Laramie of 1868 ("the Treaty"). The Treaty established the Great Sioux Reservation and temporarily put an end to fighting between the United States and party tribes in the Great Plains. Under the Treaty, the United States acquired vast acreage of land and in exchange made a number of promises to the party tribes. The promise that is central here is found at Article XIII of the Treaty, which states: "The United States hereby agrees to furnish annually to the Indians the physician, teachers, carpenter, miller, engineer, farmer, and blacksmiths, as herein contemplated, and that such appropriations shall be made from time to time . . . as will be sufficient to employ such persons." In Article IV, the United States also agreed to provide a residence for the physician. And, in Article IX, the United States reserved a privilege to withdraw the physician after 10 years, but only if the United States paid $10,000 annually to the tribes. Because they were not proficient in the English language, each of the Sioux representatives indicated their signature on the Treaty by marking an "X."

---

[1]The Honorable Roberto A. Lange, Chief Judge, United States District Court for the District of South Dakota.

In the years that followed, we know from the Annual Reports of the Commissioner of Indian Affairs that the Agencies assigned throughout what is now the Great Plains Region[2] worked on behalf of the United States to improve conditions of tribal life with regard to health and sanitation, farming, education and the like. For example, in 1878 the Cheyenne River Agency reported that sanitary conditions were "improving but still far from satisfactory," with the physician reporting favorably that "the native medicine men are now but rarely consulted by the Indians, who generally come to the agency for treatment and medicines." 1878 ANN. REP. OF THE COMMISSIONER OF INDIAN AFF. 23. In 1882, the Pine Ridge Agency likewise reported "good progress in gaining the confidence of the Indians and inducing them to abandon their native medicine," but noted that the physician would need at least one assistant in the village to meet the tribe's needs. 1882 ANN. REP. OF THE COMMISSIONER OF INDIAN AFF. 38. That same year, the Standing Rock Agency requested that a hospital be erected as soon as practicable, to give proper care to the sick, "inspire . . . greater confidence . . . and be another convincing proof of the good intention of the government toward them." Id. at 46. Similar reports continued into the 1900s. See e.g., 1905 ANN. REP. OF THE COMMISSIONER OF INDIAN AFF. 278 (referencing two changes in the resident physician and reporting a measles epidemic at the Devils Lake Agency).

More than a half century after the Treaty, in 1921, the Snyder Act authorized Congress to "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States . . . [f]or relief of distress and conservation of health." 42 Stat. 208

---

[2]According to the Department of Interior, the Bureau of Indian Affairs Great Plains Region now supports 16 tribes located in North Dakota, South Dakota and Nebraska, including the Rosebud Agency. U.S. Dep't of the Interior, Indian Affairs, *Great Plains Region*, https://www.bia.gov/regional-offices/great-plains.

(codified at 25 U.S.C. § 13).[3]  In 1976, Congress passed the Indian Health Care Improvement Act ("IHCIA"), which established the Indian Health Service ("IHS")[4] and recognized a "major national goal of the United States is to provide the quantity and quality of health services which will permit the health status of Indians to be raised to the highest possible level."  Pub. L. No. 94-437, §§ 2, 601, 90 Stat. 1400 (codified as amended at 25 U.S.C. §§ 1601, 1661).  The IHCIA states: "[I]t is the policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to Indians . . . to ensure the highest possible health status for Indians . . . and to provide all resources necessary to effect that policy."  25 U.S.C. § 1602.  The Snyder Act thus marked the beginning of Congressional funding for healthcare to all federally-recognized tribes, and the IHCIA established the structure to deliver healthcare services throughout Indian country.

## B.     Facts and Procedural History

Because the Tribe is federally-recognized, its members are eligible to receive healthcare services from IHS.  IHS operates the Rosebud Hospital in Rosebud, South Dakota.  Rosebud Hospital is the primary source of healthcare services to approximately 28,000 Native Americans in the south-central region of South Dakota.  In November 2015, the Centers for Medicare & Medicaid Services ("CMS") found considerable deficiencies in the emergency care provided by the Rosebud Hospital.

---

[3]The Snyder Act originally directed those appropriations through the Bureau of Indian Affairs, under the supervision of the Secretary of the Interior. In 1954, Congress transferred relevant healthcare-related functions to what is now the Department of Health and Human Services ("HHS").  See 25 U.S.C. § 13; 42 U.S.C. § 2001.

[4]Today, IHS provides federal healthcare and health advocacy for approximately 2.6 million American Indians and Alaskan Natives among the 574 federally-recognized tribes in 37 states.  U.S. Dep't of Health and Human Serv., Indian Health Serv., *About IHS*, www.ihs.gov/aboutihs.

CMS determined the identified deficiencies resulted in "an immediate and serious threat to the health and safety of patients." As a result, on December 5, 2015, IHS placed the Rosebud Hospital Emergency Department on "divert" status, which meant emergency patients were diverted approximately 50 miles away to hospitals in either Winner, South Dakota, or Valentine, Nebraska. Shortly thereafter, the hospital's operating hours were reduced. In June 2016, surgical and obstetrics services were diverted as a result of staffing shortages. The Emergency Department eventually reopened on July 15, 2016.

The persistent deficiencies at Rosebud Hospital prompted the Tribe to file a Complaint against the United States, HHS and its Secretary, IHS and its Acting Director, and the Acting Director of the Great Plains Area of the IHS (collectively, "the Government"), seeking declaratory and injunctive relief. The district court granted the Government's motion to dismiss several statutory and constitutional claims. Allowed to proceed was the Tribe's claim alleging the Government has a "specific, special trust duty, pursuant to the Snyder Act, the IHCIA, [the Treaty], and federal common law, to provide healthcare services to the Tribe and its members and to ensure that health care services provided . . . do not fall below the highest possible standards of professional care." Complaint at ¶61.

After discovery, the parties filed cross-motions for summary judgment. The district court denied the Government's motion, while granting the Tribe's motion in part and denying it in part. Specifically, the district court held the Tribe overstated the Government's duty when it asserted the Government had "breached its duty to provide the level of care that will raise the health status of the Tribe to the 'highest possible level.'" Rosebud Sioux Tribe v. United States, 450 F.Supp.3d 986, 1003 (D.S.D. 2020). The district court did, however, decide that the Government owed the Tribe a judicially enforceable duty "to provide competent physician-led health care to the Tribe's members." Id. The Government appeals.

## II.     DISCUSSION

We review *de novo* a district court's decision granting summary judgment. Green Plains Otter Tail, LLC v. Pro-Environmental, Inc., 953 F.3d 541, 545 (8th Cir. 2020).  Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

On appeal, the Government asserts the doctrine of Indian trust law controls and no duty to provide healthcare exists because the Tribe cannot establish the existence of a trust corpus. The Government, however, misapprehends the holding below and overstates the application of the trust law doctrine under the circumstances presented here.

Each of the foundational cases in the area of Indian trust law have a common source of jurisdiction: the Tucker Act, 29 U.S.C. § 1491.  But, the Tucker Act confers jurisdiction to individual claimants premised originally in the Court of Claims.  See United States v. Mitchell, 445 U.S. 535, 538–40 (1980) (Mitchell I).  The same is true for tribal claimants who bring claims pursuant to § 24 of the Indian Claims Commission Act, 28 U.S.C. § 1505, which is commonly referred to as the Indian Tucker Act.  United States v. Mitchell, 463 U.S. 206, 211–15 (1983) (Mitchell II). Neither the Tucker Act nor the Indian Tucker Act, however, confer any substantive right against the United States to recover money damages.  The right to claim money damages must be found in "some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.'"  Id. at 216 (quoting 28 U.S.C. § 1491).

In Mitchell I and Mitchell II, the Supreme Court considered claims for money damages brought pursuant to the Indian Tucker Act, alleging mismanagement of timber resources held in trust by the Government on the Quinault reservation in Washington.  In Mitchell I, the Court held the Indian General Allotment Act of 1887

("IGAA")[5] created only a "limited trust relationship" because the IGAA did not give the Government "full fiduciary responsibility" to manage timber resources. 445 U.S. at 542–43. In Mitchell II, however, the Court analyzed the trust relationship under a series of federal timber management statutes and other provisions. The Court determined that the Government exercised "elaborate control" over tribal monies and property, which "necessarily" created a fiduciary relationship. 463 U.S. at 225. "All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds)." Id. "Our construction of these statutes and regulations is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people." Id.

Two decades later, Navajo I and Navajo II further defined the elements of a trust relationship—again, in a suit for monetary damages. See United States v. Navajo Nation, 537 U.S. 488 (2003) (Navajo I); United States v. Navajo Nation, 556 U.S. 287 (2009) (Navajo II). The Navajo Nation brought a suit against the Department of Interior for breach of fiduciary duty related to the Government's approval of coal lease amendments negotiated years earlier by the tribe. The Supreme Court recognized the existence of a fiduciary duty but held that monetary damages could not attach under either the Indian Mineral Leasing Act of 1938[6] (Navajo I) or other statutes and regulations that ostensibly showed Government control over the coal resources (Navajo II). Although the "undisputed existence of a general trust relationship" between the Government and the tribe could "reinforce" the existence of a fiduciary relationship, "that relationship alone is insufficient" to support jurisdiction for a claim of money damages under the Indian Tucker Act. 537 U.S. at 506. See also Navajo II, 556 U.S.

[5]24 Stat. 388, as amended, 25 U.S.C. § 331 et seq. (1976 ed.) (§§ 331–333 repealed 2000).

[6]52 Stat. 347, 25 U.S.C. § 396a et seq.

at 302 (money damages do not attach under the Indian Tucker Act where tribal litigant "cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated").

Here, the Tribe seeks only declaratory and injunctive relief arising under the Treaty, the Snyder Act, the IHCIA, and federal common law. The Tribe makes no claim for money damages, which necessarily means that the Indian Tucker Act cannot provide jurisdiction. The Tribe's case does not rely on Indian trust law doctrine but instead on interpretation and construction of the Treaty, the trust relationship between the Government and the Tribe, and the statutory scheme underlying the alleged duty to provide healthcare.

Although the Tribe seeks a declaratory judgement, the Tribe still must identify a substantive source of the duty. See United States v. Jicarilla Apache Nation, 564 U.S. 162, 176–177 (2011) (acknowledging "the undisputed existence of a general trust relationship" between the Government and tribes; any trust obligations must be grounded in a statutory scheme); Blue Legs v. U.S. Bureau of Indian Affairs, 867 F.2d 1094 (8th Cir. 1989) (upholding judgment under Snyder Act provision creating affirmative obligation to relieve distress and conserve health of Indians); Navajo Tribe of Indians v. United States, 624 F.2d 981, 988 (Ct. Cl. 1980) (the existence of an equitable obligation to a tribe depends on "the terms of some authorizing document (e.g. statute, treaty, executive order)"). The question we address is whether the Treaty and other relevant statutes when read in conjunction create a duty for the Government to provide "competent physician-led health care" to the Tribe and its members. We look first to the Treaty.

A.

"The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well

-8-

established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." County of Oneida v. Oneida Indian Nation of N.Y., 470 U.S. 226, 247 (1985) (citations omitted). We apply the same principle to statutory construction. Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985). And, "we interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196 (1999).

First and foremost, the Treaty promised the Government would "furnish annually" a physician and that "such appropriations shall be made from time to time . . . as will be sufficient to employ" the physician. The Treaty also provided housing to the physician. The Government reinforced that promised over the years following the Treaty when it persistently delivered healthcare throughout the region and encouraged tribal members to abandon their cultural medicines in favor of Government healthcare. Under the Treaty, the Government established clinics and delivered healthcare. We construe the Treaty liberally in favor of the Tribe. Both the language of the Treaty and the conduct of the Government under its terms reflect an expectation on the part of the Tribe that the Government would provide them with healthcare. Moreover, that the tribal signatories spoke very little English and signed their names with an "X" further emphasizes the need to carefully consider how the Government's actions may have impacted their understanding of the agreement. In short, the historical record reflects decades of the Government providing healthcare after the Treaty, in exchange for the Tribe's continued trust in the Government.

## B.

Years later, the Government's promise was reinforced by the Snyder Act, which authorized appropriations "for the benefit, care, and assistance of the Indians throughout the United States . . . [f]or relief of distress and conservation of health," 25 U.S.C. § 13, and by the IHCIA, which established the IHS with the stated goal to raise

the health status of Indians "to the highest possible level," 25 U.S.C. § 1601. Indeed, the Supreme Court has acknowledged IHS's "statutory mandate to provide health care to Indian people." Lincoln v. Vigil, 508 U.S. 182, 194 (1993).[7] It is within this context that the district court found a duty to provide healthcare. See also Blue Legs, 867 F.2d at 1100 (holding "the Snyder Act imposes affirmative obligations on [the Government] to relieve distress and conserve Indian Health"); White v. Califano, 581 F.2d 697, 698 (8th Cir. 1978) ("We think that Congress has unambiguously declared that the federal government has a legal responsibility to provide health care to Indians. This stems from the 'unique relationship' between Indians and the federal government . . . ."); Quick Bear v. Leupp, 210 U.S. 50 (1908) (a trust duty necessary attaches to appropriations that fulfill treaty obligations, which are repayment of treaty debt in installments).

We are unpersuaded by other cases cited by the Government for the principle that no trust duty exists. In Quechen Tribe v. United States, the Ninth Circuit held that "the federal-tribal trust relationship does not, in itself, create a judicially enforceable duty." 599 F.App'x 698, 699 (9th Cir. 2015). The Ninth Circuit explained: "Neither the Snyder Act nor the [IHCIA] contains sufficient trust-creating language on which to base a judicially enforceable duty. Both statutes 'speak about Indian health only in general terms,' and neither requires the United States to provide a specific standard of medical care." Id. (quoting Lincoln, 508 U.S. at 194). However, Quechen Tribe did not involve an operative treaty to create the specific trust relationship. In the instant case, unlike in Quechen Tribe, the Treaty sets forth a duty that was consistently

_____

[7]In Lincoln, the Supreme Court considered whether IHS's decision to reallocate funding from a program that serviced disabled children in the Southwest to a nationwide children's health program was subject to judicial review under the APA, and whether notice-and-comment rulemaking should have been used to make the decision. 508 U.S. at 184. The Court acknowledged the "special trust relationship" between tribes and the Government, and IHS's "statutory mandate to provide health care to Indian people." Id. at 194.

-10-

reinforced by the conduct of the Government decades before the adoption of the Snyder Act and IHCIA. The Snyder Act and the IHCIA merely reinforced a prior existing duty and relationship between the Tribe and the Government.

Likewise, in Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs., we upheld the district court's dismissal of the tribe's vague allegations, brought under the APA, that general trust principles created a duty to continue emergency operations by an IHS hospital. 533 F.3d 634 (8th Cir. 2008). In Yankton Sioux Tribe, the tribe failed to allege the "violation of any statutory or treaty obligation that could be characterized as a breach of trust or fiduciary duty." Id. at 644. Not so here, where the Tribe has specifically alleged that the Treaty, together with the Snyder Act and IHCIA, create a such a duty.

Finally, we disagree with the Government's argument that the declaratory judgment issued below is too vague or abstract. The Declaratory Judgment Act permits the judiciary to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). To proceed successfully under the Declaratory Judgment Act, there must be a "substantial controversy" that presents a "concrete and specific" question. Caldwell v. Gurley Refining Co., 755 F.2d 645, 649–50 (8th Cir. 1985) (quoting Maryland Casualty Co. v. Pacific Coal and Oil Co., 312 U.S. 270, 273 (1941)). We have that here.

The record confirms a history of documented deficiencies in the quality of healthcare provided to members of the Tribe at Rosebud Hospital. The Tribe asks this court to define the Government's accountability for those deficiencies. Given the special trust relationship between the Government and the Tribe, the history of reinforced promises, and the unacceptable state of healthcare provided at Rosebud Hospital, the district court's order is a treaty-based declaration to define (and assign) the duty owed to the Tribe in light of IHS's stated purposed to raise the level of Indian

healthcare. The "physician-led" portion of the duty is based on the Government's promise—originating from the Treaty—to furnish a physician and to appropriate funds to employ the physician. The "competency" portion of the duty comes from the recognition that some "adjustment and accommodation" must occur to make a tribe whole when treaties are read decades later. See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 681 (1979). After all, it is difficult to imagine a set of circumstances in which the Tribe would have agreed to the Government's delivery of "incompetent" healthcare. The declaratory judgment below gives meaning to promises made, and it assigns to the Government a measure of accountability for persistent deficiencies at Rosebud Hospital.

We do not aim to assign any greater responsibility to the Government than the circumstances of this case, and the Treaty at issue here, require. In this specific case, the Government must do better.

## III. CONCLUSION

The Treaty created a duty, reinforced by the Snyder Act and the IHCIA, for the Government to provide competent, physician-led healthcare to the Tribe and its members. We affirm.

KOBES, Circuit Judge, dissenting.

I share the court's concern about healthcare in Rosebud. There have been "considerable deficiencies in the emergency care provided by" Indian Health Services. Maj. Op. at 4. Those and other problems have been "persistent." Maj. Op. at 5. But I am compelled to dissent because neither the 1868 Treaty of Fort Laramie nor the later

statutes created a judicially enforceable duty to provide the Rosebud Sioux Tribe[8] with "competent physician-led health care." D. Ct. Dkt. 101 at 30. The historical evidence makes it clear that the physician was supposed to be a temporary instructor, not a permanent service provider. The Treaty promised only one physician because the doctor's role was to teach the Sioux how to administer medicine—not to provide healthcare to the entire Tribe.

## I.

The statutes the court discusses do not create a duty to provide healthcare. As the Ninth Circuit explained in *Quechan Tribe of the Fort Yuma Indian Reservation v. United States*, "[n]either the Snyder Act nor the Indian Health Care Improvement Act contains sufficient trust-creating language on which to base a judicially enforceable duty." 599 F. App'x 698, 699 (9th Cir. 2015) (unpublished). The court seems to agree, distinguishing this case from *Quechan Tribe* only because "*the Treaty* sets forth a duty that was consistently reinforced by the conduct of the Government decades before the adoption of the Snyder Act and IHCIA." Maj. Op. at 10–11 (emphasis added). The court also says that those two statutes "merely reinforced *a prior existing duty* and relationship between the Tribe and the Government." Maj. Op. at 11 (emphasis added). If a duty exists, it must come from the Treaty. The court and I disagree about whether the Treaty created that duty.

## II.

---

[8]As I understand it, the Rosebud Sioux Tribe's Lakota name is Sicangu Lakota Oyate. But because the Tribe, the Government, and the court all refer to the Tribe as the Rosebud Sioux Tribe, so will I. I also refer more generally to the "Sioux," even though that term is an exonym used to describe the various bands of the Lakota, Nakota, and Dakota people.

"Indian treaties must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians." *Herrera v. Wyoming*, 139 S. Ct. 1686, 1699 (2019) (citation omitted). Because the Government held superior bargaining power over tribes, "the words of a treaty must be construed in the sense in which they would naturally be understood by the Indians." *Id.* (citation omitted). "But the federal government generally is not obligated to provide particular services or benefits in the absence of a specific provision in a treaty, agreement, executive order, or statute." *Vigil v. Andrus*, 667 F.2d 931, 934 (10th Cir. 1982).

## A.

The Government argues that there is no specific language in the Treaty that "purport[s] to create any fiduciary duty [to provide healthcare]." Gov. Br. 16. The Rosebud Sioux Tribe, on the other hand, says that the Government assumed a duty to provide the Tribe with "competent, physician-led health care" when it promised to provide a physician and pay for the physician's housing and salary. Tribe Br. 19–20.

The Tribe points to Article XIII, which says: the Government "hereby agrees to furnish annually to the Indians the physician . . . and that such appropriations shall be made from time to time . . . as will be sufficient to employ [the physician]." Treaty with the Sioux Indians, 15 Stat. 635. The Tribe acknowledges that "[c]ourts must focus on the historical context of an agreement between the United States and a tribe" to give meaning to the Treaty. Tribe Br. 26. But it offers no historical sources to support its understanding of Article XIII. And despite the Tribe's claim that the Sioux "agree[d] to exchange millions of acres of their lands for the provision of health care services" in a "bargained-for exchange," Tribe Br. 22–23, the Sioux did not give up quite that much.[9]

---

[9]While the 1868 Treaty reduced by over half the roughly "60 million acres" of land recognized as core Sioux territory in the 1851 Treaty of Fort Laramie, it did not

-14-

grant complete control over that original Sioux territory—referred to in the 1868 Treaty as "unceded Indian territory"—to the Government. Alan L. Neville & Alyssa K. Anderson, *The Diminishment of the Great Sioux Reservation Treaties, Tricks, and Time*, 33 Great Plains Q., Fall 2013 237, 238–39; *see also Section 3: The Treaties of Fort Laramie, 1851 & 1868*, STATE HIST. SOC'Y OF N.D., https://www.ndstudies.gov/gr8/content/unit-iii-waves-development-1861-1920/lesso n-4-alliances-and-conflicts/topic-2-sitting-bulls-people/section-3-treaties-fort-larami e-1851-1868.

In fact, Article XVI of the 1868 Treaty required the Government to abandon its forts and roads in that territory, and the Treaty forbade white Americans from settling on or entering upon it without prior consent from the Sioux. So while the Sioux promised not to permanently settle on the territory outside the Great Sioux Reservation, the "unceded Indian territory" remained largely under Sioux control, at least under the Treaty's terms.

This scheme makes sense in historical context. To pressure the Sioux to adopt white American customs, the Government got the Sioux to agree to permanently settle only in a centralized agricultural region—something that had to happen before schools could be built and before farmland could be divided up among families. At the same time, the Treaty kept the unceded Indian territory under Sioux control and recognized the Sioux's exclusive right to use that land for hunting. Art. XI, 15 Stat. 635. Also, the 1868 Treaty actually *expanded* some Sioux territory, granting the Sioux exclusive settlement rights to land that belonged to the Ponca tribe, with whom the Sioux had long fought but never conquered. *See* SETH KING HUMPHREY, THE INDIAN DISPOSSESSED 144, 149–50, 187–88 (1906). The Ponca's land, "among the very best in Dakota," was later handed over to the Sioux by the Government. 1877 COMM'R OF INDIAN AFF. ANN. REP. 48. The Sioux were not forced to sacrifice all control over much of their land until the infamous 1876 "agreement" and 1877 Act of Congress, which abrogated the Fort Laramie Treaty and which the Supreme Court held unlawfully took the Black Hills and much of the unceded Indian territory away from the Sioux without just compensation. *See United States v. Sioux Nation of Indians*, 448 U.S. 371, 382–83, 423–24 (1980).

Still, the Tribe argues that traditional canons of Indian law put the Government's obligation to provide "competent physician-led health care" beyond debate. Tribe Br. 20–21, 28. But neither the Tribe's argument nor the court's holding can be squared with those canons. When interpreting Indian treaties, "we look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999) (citation omitted). We "cannot ignore plain language that, viewed in historical context and given a fair appraisal, . . . clearly runs counter to a tribe's later claims." *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774 (1985) (citation omitted). "We stop short of varying [treaty] terms to meet alleged injustices" because doing that is a task "for the Congress," not courts. *Nw. Bands of Shoshone Indians v. United States*, 324 U.S. 335, 353 (1945). In short, "we may not interpret the 1868 Treaty in a way that the United States would not reasonably have agreed to adopt at the time of signing." *Jones v. United States*, 846 F.3d 1343, 1356 (Fed. Cir. 2017).

B.

I start with the Treaty's plain language: Article XIII says that the Government must furnish and pay for "the physician, teachers, carpenter, miller, engineer, farmer, and blacksmiths, as herein contemplated." But contrary to the Tribe's argument that this means that "the federal government will provide health care," Tribe Br. 22, the text does not say that. The text makes one thing clear, though: the Government was required to provide multiple "*teachers*" and "*blacksmiths*," but only a single "*physician*." This plays out in other parts of the Treaty, too, as Articles VII and VIII list events that trigger the introduction of additional teachers and the second blacksmith, respectively. There is nothing about more doctors. A single physician could not provide competent healthcare to more than fourteen thousand people spread

-16-

over millions of acres.[10]  So, if the physician wasn't required to provide medical care to the entire Sioux population, what *was* this physician required to do?  I look to the entire structure of the Treaty next.

C.

The Treaty is quickly summarized.  Article I declares a permanent end to war and establishes rules for future disputes between the Sioux and the United States.  Article IV requires the Government to construct several buildings on the reservation, including a house for the physician, and Article V requires the Government to provide an agent for the Sioux.[11]  Article VI provides that the Sioux could establish homesteads by farming the land and thereby become American citizens.  Article VII declares that "the necessity of education is admitted" "[i]n order to insure the civilization of the

---

[10]While reliable historical population records for the various Sioux tribes are difficult to find, a 1994 survey of historical sources estimated that the total Teton Sioux population in 1868 was approximately between 13,860 and 14,370 people.  *See* Kingsley M. Bray, *Teton Sioux: Population History, 1655–1881*, 75 NEB. HIST. 165, 174–76 (1994), https://www.nebraskahistory.org/publish/publicat/history/full-text/1994-Teton_Sioux.pdf.  For comparison's sake, before the Civil War, "the United States had a peace time army of 16,000 soldiers," and "113 doctors"—roughly one doctor per 142 soldiers.  Robert F. Reilly, *Medical and Surgical Care During the American Civil War, 1861–1865*, 29 BAYLOR UNIV. MED. CTR. PROC. 138, 139 (2016).

[11]The Indian Agent was required to live with the Sioux and was tasked with keeping "an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against" the Sioux, in addition to "the faithful discharge of other duties enjoined on him by law."  The Treaty also required the Indian Agent to manage stored goods, help assign and record tracts of farming land, induce children to attend school, take an annual census, hand out prize money for growing the most valuable crops, and collect evidence in property disputes.

Indians entering into this treaty."[12]  It also provides that "for every thirty children between [the age of six and sixteen]," a schoolhouse will be provided and a teacher "shall be furnished . . . and faithfully discharge his or her duties as a teacher."[13]  Article VIII promises to aid the Sioux in becoming self-sufficient farmers.  It provides that each head of a family who begins to farm "shall receive instruction from the farmer herein provided for," and will be provided with "seeds and agricultural implements for the first year" of farming and for three years thereafter.  It also says that after "one hundred persons shall enter upon the cultivation of the soil, a second blacksmith shall be provided, with such iron, steel, and other material as may be needed."

Several more Articles lay out additional promised benefits, such as clothing, oxen, and prize money for growing the most valuable crops.  Healthcare is not mentioned.  Finally, the Government reserved the right to withdraw the farmer, physician, and other professionals (except for the teachers and second blacksmith) after ten years so long as "an additional sum thereafter of ten thousand dollars per annum shall be devoted to the education of said Indians."  Art. IX, 15 Stat. 635.  In exchange, the Sioux agreed not to attack any Americans or tribes allied with the Government and to withdraw their opposition to railroad construction on the Great Plains, while ceding the right to permanently settle on unceded Indian territory outside the Great Sioux Reservation.  Art. XI, 15 Stat. 635.

The Treaty's purpose was to end violence between the Sioux, the United States, and allied tribes.  It did that by pressuring the Sioux to permanently settle onto a

---

[12]The reader may take offense at the Treaty's implication that the Sioux, a large and diverse group of people with longstanding customs and traditions, were "uncivilized."  I do, too.  But that was the Government's point of view.  Here and elsewhere, I present the historical sources on their own terms.

[13]This is the only time a Treaty professional is obliged to "faithfully discharge" the duties of his or her profession.

-18-

somewhat-centralized agricultural reservation, *see* n.3, *supra*. The Treaty's related goal was to induce the Sioux to abandon their traditional way of life with promises of temporary rations, individual property, protection, education, and citizenship. But the Treaty does not discuss the physician with any detail, so the doctor's role is still unclear.

The Treaty's structure offers a clue, though: While the Government promised to construct buildings for all the Treaty professionals, including a schoolhouse and a mill, no professional is given supplies except the second blacksmith. Because including something for one Treaty professional implicitly excludes it for others, we know the others were not supposed to be provided with supplies for their jobs. So, the Treaty's terms sketch out a purposeful design: with the exception of the teachers (who were required by the Treaty to teach, regardless of the lack of supplies) and the second blacksmith, no Treaty professional was required to provide their services for the Sioux.

D.

That is perhaps a surprising suggestion, but it is inescapable in light of the historical record. Our task is not to figure out what the Treaty *should* have looked like, but rather what the Sioux *actually* understood and assented to at the time the Treaty went into force. *Herrera*, 139 S. Ct. at 1699. So, I move on to consider the "larger context that frames the Treaty." *Mille Lacs Band*, 526 U.S. at 196. To do that, I look to the historical record, which "provides insight into how the parties to the Treaty understood the terms of the agreement." *Id.* That "insight is especially helpful to the extent that it sheds light on how the . . . [Sioux] understood the agreement" at the time. *Id.* This understanding is binding, even if it "runs counter to a tribe's later claims." *Klamath Indian Tribe*, 473 U.S. at 774.

The Tribe does not point to any historical sources showing how the Sioux understood the Treaty at the time. That is understandable because Sioux-authored

records from then are rare.  The only contemporaneous sources I have been able to find are reports written on behalf of the various Sioux tribes by the Government's Indian Agents.  But because those reports were written by federal employees with their own biases, they are not the best record of how the Sioux understood the Treaty.  Still, the court relies on them, and even with their imperfections, they are the best sources available.

An 1868 report from the Upper Missouri Agency includes the earliest reference to the physician.  The Indian Agent remarked that the agency physician, "Dr. Livingston[,] has been very successful in his professional efforts among these Indians." 1868 COMM'R OF INDIAN AFF. ANN. REP. 192.  But, the report said, the physician "has experienced great inconvenience in his practice for the want of necessary medicines." *Id.*  Plus, "[t]he doctor has been more than a year in the service, but has not received a dollar in compensation." *Id.*  The report closed with a request that Congress "make an annual appropriation for the support of a physician and purchase of medicines for these Indians." *Id.*

At first glance, this seems to support the court's interpretation of the Treaty—after all, the physician is implied to have been providing medical services. But those services were not offered with the Treaty in mind:  Dr. Livingston had been working for "more than a year" without Congressional appropriation or support as of September 1868, *id.*, which means he was there before the Treaty was signed, let alone ratified.[14]  From this, and because the Indian Agent did not base his request for funds on the Treaty, I don't think that Dr. Livingston was acting to fulfill any Treaty obligation.

---

[14]The Treaty was ratified by the Senate in February 1869.  President Andrew Johnson's Proclamation Regarding Treaty with the Sioux at Fort Laramie, https://www.docsteach.org/documents/document/fort-laramie-treaty-ratification.

The Treaty's goal was not to provide medical services to the Sioux for all of time; rather, it was to instruct the Sioux about how to provide their own medical care. The physician was primarily an instructor, not a healthcare provider. For example, the 1869 Grand River Agency report recounted that "[m]ost of the [Sioux there] seem much pleased at their elevated position and speak favorably of peace and call upon the whites for instructions." 1869 COMM'R OF INDIAN AFF. ANN. REP. 319. The Indian Agent's report also said that the Sioux found the Government's administration of the agency "satisfactory," and that "with the assistance of two or three whites to teach and assist them . . . it would not be long ere they rivaled other more civilized tribes." *Id.*

Other reports echoed similar sentiments and recorded that the Sioux understood the Treaty's terms. In 1869, the Whetstone Agency reported that the Sioux there were "mostly inclined to cultivate the soil, and adopt the habits of civilized life." *Id.* at 315. The same report noted that "[t]hough the force of example [by whites who married into Indian families] does not always work to the advantage of the Indians . . . yet in the main it is to their advancement, they (the Indians) learning from the whites, whom they recognize as relatives, much more readily than from others not connected with them." *Id.* at 315–16. And while the Treaty "ha[d] not been fulfilled" yet, it "was fully explained to the chiefs and head men, entered into in good faith, and all its provisions distinctly remembered [by them]." *Id.* at 316. Healthcare services are never mentioned. Instead, the constant thread is that the Government, through its employees, would instruct the Sioux about how to live like "civilized" white Americans rather than provide for them.

Later reports, like the 1873 Grand River Agency report, continue that trend. The Indian Agent said that because little progress had been made, "all operations should be directed and assisted by skilled and intelligent agriculturalists . . . until such time as the Indians may become sufficiently skilled." 1873 COMM'R OF INDIAN AFF. ANN. REP. 231. The Indian Agent noted that a "considerable expenditure of money" would be necessary, "but if progress is hoped for, in the effort to render the Sioux Indians self-

sustaining on a civilized basis, the outlay seems to me to be most essential." *Id.* The physician from the 1868 Upper Missouri report recorded a similar sentiment: the 1873 Upper Missouri Agency report, authored by Dr. Livingston in his new capacity as Indian Agent, noted that "these Indians will [soon] be thrown entirely upon their own resources" because the Treaty's provisions for rations were about to expire, but that the Sioux there would be "wholly incapable of [surviving] at the present time," and so special legislation from Congress was necessary to temporarily provide for their needs. *Id.* at 233.

Even the Sioux at the Flandreau Special Agency, Presbyterian converts who survived without tribal or Government support for years, understood the Treaty professionals as instructors, not providers. Their pastor, who doubled as their Indian Agent after the Government learned of their settlement, recorded that the Flandreau Sioux "desire[d] for rapid advance in civilization," which they sought to secure by "throwing every man on his own responsibility," leaving their tribes and starting their own family farms once they learned about the Treaty—three years before the Government became aware of them. 1874 COMM'R OF INDIAN AFF. ANN. REP. 241.

The 1874 report explained that the new Flandreau Special Agency's goal was "to encourage [the Sioux] by counsel and the gift of farming-implements to rely upon their own efforts for their support." *Id.* And because there were several white settlers around that agency, the Indian Agent reported that "it is believed [the settlers'] example will do more to show [the Sioux] how they must labor if they would succeed than an employed instructor, and therefore a superintendent of farming and other [Treaty professionals] are not needed." *Id.* Of particular note is that the Indian Agent reported that most deaths at the agency were the result of whooping-cough, and because the Sioux did not know "the proper management of sickness," the Government would "need to use every effort to enlighten them." *Id.* Despite the obvious need in this case for healthcare among a group of families that labored without outside support

for three years, no mention is made of providing that service—instead, the focus was on teaching the Sioux American methods of sanitation.

That focus extended to the other Treaty professionals, too: the same report notes that "some of the young men have asked to learn the blacksmith and carpenter trades, and, if a suitable place could be found for them, it would be an excellent thing." *Id.* at 242. Two years later, in 1876, the Flandreau Special Agency report explained that "[n]o other trades have yet been learned." 1876 COMM'R OF INDIAN AFF. ANN. REP. 28. Still, the Indian Agent reported that "[t]hey desire to be independent, and I hope will soon be able to be so." *Id.*

Sioux in other regions of the Great Sioux Reservation also understood the Treaty's goal as providing instruction for eventual self-sufficiency, rather than healthcare from the Government in perpetuity. The Standing Rock Agency report from 1875 explained that the Sioux "appear to comprehend their situation and realize . . . the necessity of adopting the same modes of living that white men do, in order to lay the foundation for their future permanent welfare." 1875 COMM'R OF INDIAN AFF. ANN. REP. 245. The report also recounted that the Sioux at the agency "fully recognize the obligations of their contract under the [Treaty], and manifest an anxiety to learn what is required of them under its provisions." *Id.* And in 1876, the report from Standing Rock noted that the Sioux chiefs at the agency asked that Article XIII would be "carried into effect," and "expressed . . . their perfect willingness to cooperate with any measure to be adopted for their material improvement and social progress." 1876 COMM'R OF INDIAN AFF. ANN. REP. 39. The same report also recorded that the Sioux had "shown great willingness to comply with the advice given to them." *Id.* at 38.

These reports and others[15] establish that the Treaty's purpose—understood by the Government and the Sioux alike—was to exert pressure on the Sioux to learn to live like white Americans. Likewise, the Government and the Sioux understood that most of the Treaty professionals' duty was not to provide services, but rather to teach the Sioux until they could reasonably take up the professions themselves. Like every other Treaty professional (except the second blacksmith), the physician's task was to educate. *See, e.g.,* 1882 COMM'R OF INDIAN AFF. ANN. REP. 90 (when a chief's son suffered from pneumonia, the community watched the physician take care of him; during a later epidemic, community members took similar care of the ill). Nothing in the Treaty's text or the vast majority of historical sources suggests anything else.[16]

---

[15] *See* 1878 COMM'R OF INDIAN AFF. ANN. REP. 32 ("I am led to believe that many cases of death arise from ignorance of the simple laws of health . . . I recommend for your consideration the employment of a competent person to attend the sick, and especially to give them such instruction in the laws of health as their case demands."); *see also* 1882 COMM'R OF INDIAN AFF. ANN. REP. 88 ("The most of this labor has been performed by Indian mechanics, under the supervision of a white master-carpenter . . . ."); *id.* at 98 ("The present physician, Dr. Grinnell, has made good progress in gaining the confidence of the Indians and inducing them to abandon their native medicine men."); *id.* ("To efficiently minister to the wants of so many Indians, however, scattered as they are over the reserve, the physician should have at least one assistant to attend to the village practice.").

[16] While there is no right to healthcare in the Treaty, the Tribe's members have access to a statutory remedy if a Government-employed physician practices medicine so incompetently that it amounts to medical malpractice. The Federal Tort Claims Act allows members of Indian tribes to sue the Government for personal injury or death resulting from negligent medical care performed by IHS or IHS contractors. *See The Federal Tort Claims Act*, https://www.ihs.gov/riskmanagement/manual/manualsection07/ (citing 28 U.S.C. §§ 1346(b), 2401(b), 2671–2680; and 25 U.S.C. §§ 458aaa-15, 5321(d)).

III.

I conclude that no one—neither the Government nor the Sioux—understood the Treaty to require a single physician to take care of every Tribe member's health needs for centuries to come. The court's wishful and admirable thinking about the Government's benevolence towards Indian tribes in 1868 rewrites the raw deal the Government forced upon the Sioux—and, by rewriting the Treaty, the court impermissibly morphs it into something the Government would not have accepted at the time. *Jones*, 846 F.3d at 1356.

Despite the court's promise that its opinion is limited to this specific case, it has far-reaching consequences. Article XIII provides for much more than a single doctor—the Government is also required to furnish the Tribe with "[a] carpenter, [a] miller, [an] engineer, [and a] farmer." The court's reasoning would require the Government to provide "competent carpenter-led construction"; "competent miller-led grain processing and storage"; "competent engineer-led design"; and "competent farmer-led agriculture." Maybe that's what the Government *should* have agreed to do. But we are bound by the real agreement, and the Treaty did not provide for ongoing healthcare.

Two centuries ago, Justice Story cautioned that courts lack "any treaty-making power," and that "to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions." *The Amiable Isabella*, 19 U.S. 1, 71 (1821). "[O]ur duty is to follow [the text and original understanding of the Treaty] as far as it goes, and to stop where that stops—whatever may be the imperfections or difficulties which it leaves behind." *Id*. The Government ought to do better by the Tribe. But we are not the people's elected representatives. Our duty is to the Constitution and the rule of law. In keeping with the limits of the judicial power, I would refuse to write into

the Treaty a promise the Government never made and the Sioux never accepted.  I respectfully dissent.

_____