Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 11, 2023

## 2023 CO 48

**No. 22SC670, *People in the Int. of A-J.A.B. v. H.J.B.* — Indian Child Welfare Act — Termination of Parental Rights — Dependency and Neglect — Notice Requirements — Due Diligence — Statutory Interpretation**

In this case, the supreme court considers what constitutes due diligence under section 19-1-126(3), C.R.S. (2022), when a child that is the subject of a dependency and neglect case may be an Indian child as that term is defined in the federal Indian Child Welfare Act. 25 U.S.C. § 1903(4). The court concludes that due diligence in this context is a concept that logically must be flexible enough to allow a juvenile court to examine the thoroughness of a petitioning party's investigation into a general claim of Indian heritage based on the specific circumstances of the claim before it.

To that end, due diligence under section 19-1-126(3) requires a petitioning party to earnestly endeavor to investigate the basis for a parent or other participant's assertion that a child may be an Indian child, to contact those family members or others who are specifically identified as having knowledge regarding

that assertion of general Indian heritage, and to learn whether additional information exists that will help the court determine whether there is reason to know that the child is an Indian child.

Applying this framework, the supreme court affirms the division, but on different grounds.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2023 CO 48

**Supreme Court Case No. 22SC670**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 21CA764

**Petitioner:**

H.J.B.,

v.

**Respondent:**

The People of the State of Colorado,

**In the Interest of Minor Child:**

A-J.A.B.

**Judgment Affirmed**
*en banc*
September 11, 2023

**Attorneys for Petitioner:**
The Morgan Law Office
Kristofr P. Morgan
  *Colorado Springs, Colorado*

**Attorneys for Respondent:**
Adams County Attorney's Office
Katherine Gregg, Deputy County Attorney
  *Westminster, Colorado*

**Attorney for Minor Child:**
Josi McCauley, guardian ad litem
*Superior, Colorado*

**Attorney for Amicus Curiae Colorado Office of Respondent Parents' Counsel:**
Zaven T. Saroyan
*Denver, Colorado*

**Attorneys for Amici Curiae Southern Ute Indian Tribe and Ute Mountain Ute Tribe:**
David C. Smith
Lorelyn Hall
James Washinawatok II
*Ignacio, Colorado*

Peter Ortego
*Towaoc, Colorado*

**JUSTICE BERKENKOTTER** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT, JUSTICE MARQUEZ, JUSTICE HOOD, III, JUSTICE GABRIEL, JUSTICE HART,** and **JUSTICE SAMOUR, Jr.** joined.

JUSTICE BERKENKOTTER delivered the Opinion of the Court.

¶1 The federal Indian Child Welfare Act ("ICWA") was enacted in 1978 amidst a rising crisis in Indian Country: Abusive child welfare practices resulted in up to a third of all Indian children being forcibly removed from their homes and sent off-reservation to be fostered and adopted by non-Indian families. *See* Felix Cohen, Handbook of Federal Indian Law §§ 11.01[1], [2] (Nell Jessup Newton ed., 2012); *see also People in Int. of My. K.M. v. V.K.L.*, 2022 CO 35, ¶ 21, 512 P.3d 132, 139 ("Congress enacted ICWA in response to 'an alarmingly high percentage of Indian families broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'") (citation omitted). As Indian tribes and families faced the loss of their children, Congress codified "substantive and procedural guardrails against the unjustified termination of parental rights and removal of Indian children from tribal life." *Haaland v. Brackeen*, 143 S. Ct. 1609, 1646 (2023) (Gorsuch, J., concurring); *V.K.L.*, ¶¶ 22-23, 512 P.3d at 140.

¶2 Among these important guardrails are ICWA's notice provisions. One purpose of these provisions is to ensure that Indian tribes know about their right to intervene in, or, where appropriate, exercise jurisdiction over child custody proceedings involving an Indian child. 25 U.S.C. § 1912(a).[1] To that end, both

---

[1] ICWA defines an Indian child as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for

3

ICWA and Colorado's ICWA implementing statute, section 19-1-126, C.R.S. (2022), impose specific notice requirements. Thus, if a juvenile court in a dependency and neglect case[2] "knows" a child is an Indian child, ICWA requires the court to ensure that the petitioning party complies with the notice requirements found in 25 C.F.R. § 23.111 (2023). Colorado's ICWA statute requires compliance with the same notice provision. § 19-1-126(1)(b); *see also* 25 U.S.C. § 1912(a).

¶3 And when the juvenile court does not "know," but instead has "reason to know," that a child is an Indian child, the court has the same obligation to ensure compliance with ICWA's notice provision. § 19-1-126(1)(b); 25 U.S.C. § 1912(a); 25 C.F.R. § 23.111. In these cases, the court must treat the child as an Indian child until it is determined on the record that the child does not meet the definition of an Indian child. § 19-1-126(2)(b).

¶4 But in some cases, a juvenile court is presented with a more general assertion that a child has Indian heritage. In some, like the case here, a parent asserts that a

---

membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

[2] We recognize that the federal and Colorado ICWA statutes apply to cases other than dependency and neglect cases, *see* 25 U.S.C. § 1912(a). But because a department of social services is the exclusive party authorized to file a dependency and neglect petition, *McCall v. Dist. Ct.*, 651 P.2d 392, 394 (Colo. 1982), and because, here, the Adams County Human Services Department moved to terminate the mother's parental rights, we limit our discussion to the requirements imposed on departments of social services.

4

member of the child's family may have Indian heritage through a particular tribe or a tribal ancestry group. That type of information, without more—as this court concluded last year in *People in Int. of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 56, 516 P.3d 924, 937—is not sufficient to give the court a "reason to know" that a child is an Indian child, and thus ICWA's notice requirements are not triggered.

¶5 Instead, these types of more generalized assertions of Indian heritage, without more, trigger the due diligence requirement, which is an additional obligation imposed by the General Assembly in section 19-1-126(3). Thus, when a juvenile court doesn't "know" or have "reason to know" that a child who is the subject of a dependency and neglect hearing is an Indian child, but learns that the child *may* have Indian heritage, the court must then direct the petitioning party to exercise due diligence in gathering additional information that would assist the court in determining if there is reason to know that the child is an Indian child. § 19-1-126(3).

¶6 But what, exactly, does that mean? More to the point, what constitutes due diligence in the context of section 19-1-126(3)? Today, we answer that question and identify the steps that a petitioning party must take to satisfy its due diligence obligation under section 19-1-126(3). We then apply this framework to the facts here and conclude that the petitioning party here satisfied its statutory due

diligence obligation under section 19-1-126(3). Accordingly, we affirm the division, albeit on different grounds.

## I. Facts and Procedural History

¶7 A-J.A.B. tested positive at birth for methamphetamine. H.J.B. ("Mother") admitted methamphetamine use during her pregnancy. In March 2020, less than a month after A-J.A.B.'s birth, the Adams County Human Services Department ("the Department") filed a petition in dependency and neglect concerning A-J.A.B. *See People in Int. of A-J.A.B.*, 2022 COA 31, ¶ 3, 511 P.3d 750, 753, *abrogated on other grounds by E.A.M.*, ¶ 56, 516 P.3d at 937 ("*A-J.A.B. I*"). The Department's petition noted that it had no information indicating that A-J.A.B. was an Indian child or eligible for membership in an Indian tribe, although the petition did not identify what efforts, if any, the Department took to determine whether A-J.A.B. was an Indian child.

¶8 At the shelter hearing, Mother's counsel informed the court that Mother may have "some Cherokee and Lakota Sioux[3] [heritage] through [A-J.A.B.'s maternal great-grandmother]."[4] *Id.* at ¶ 4, 511 P.3d at 753. However, Mother was

---

[3] "Sioux" is an exonym used to describe the bands of the Lakota, Nakota, and Dakota people. *Rosebud Sioux Tribe v. United States*, 9 F.4th 1018, 1026 n.8 (8th Cir. 2021) (Kobes, J., dissenting). Here, we follow the naming conventions of the division and parties and refer to Mother's alleged heritage as "Lakota Sioux."

[4] For ease of reference, all family members are identified based on their relationship to A-J.A.B.

uncertain if anyone in her family was actually registered with a tribe and acknowledged that she "probably [wouldn't] qualify" for any tribal membership herself. *Id.* The juvenile court ordered Mother to "fill out the ICWA paperwork," but the court did not direct the Department to exercise its due diligence obligation under section 19-1-126(3). *Id.*

¶9 At the next hearing, Mother, who had not filled out the ICWA paperwork, again stated that she had "Native American heritage" through A-J.A.B.'s maternal great-grandmother. *Id.* at ¶ 5, 511 P.3d at 753. Because of these assertions, the juvenile court found that the case "'may' be an ICWA case." *Id.* But the court did not order the Department to take any action to investigate Mother's claim of Indian heritage. In June 2020, the juvenile court entered a dispositional order; the order did not address ICWA or whether A-J.A.B. may be an Indian child.

¶10 In October 2020, "the Department's attorney asked the court to make another ICWA inquiry because the Department had 'not resolved that issue' yet." *Id.* at ¶ 6, 511 P.3d at 754. The juvenile court again stated that the case "may be an ICWA case," but did not expressly direct the Department to exercise its due diligence obligation under section 19-1-126(3). *Id.* And again, the juvenile court "ordered [M]other to submit an ICWA assessment form." *Id.* But Mother never did.

7

¶11 In December 2020, the Department moved to terminate Mother's parental rights. At the pretrial conference, Mother's attorney informed the court that she spoke with A-J.A.B.'s maternal grandmother, who stated that she "thought that the heritage may be Lakota." *Id.* at ¶ 7, 511 P.3d at 754. A-J.A.B.'s maternal grandmother told Mother's attorney that "if there's heritage then the [child's] great aunt would have the information." Nonetheless, Mother's attorney told the court "it doesn't sound like there's a reason to believe that ICWA would apply" and acknowledged that neither Mother nor A-J.A.B. were enrolled members of any tribe. *Id.* The juvenile court subsequently concluded that "there [was] no reason to believe that this case [was] governed by [ICWA]." *Id.* (alterations in original).

¶12 At the April 2021 termination hearing, the juvenile court reiterated that ICWA did not apply in this case "because 'no information ha[d] been provided to the [c]ourt regarding the respondent [M]other's enrollment [or] eligibility for enrollment in a federally recognized tribe.'" *Id.* at ¶ 8, 511 P.3d at 754 (alterations in original). The juvenile court terminated Mother's parental rights. Mother appealed.

¶13 Before a division of the court of appeals, Mother argued that the juvenile court erred in finding that ICWA did not apply because the court had a reason to know that A-J.A.B. was an Indian child. *Id.* at ¶ 9, 511 P.3d at 754; *see also* § 19-1-126(1)(a)(I)(A). According to Mother, her assertions of Cherokee and

8

Lakota Sioux heritage triggered the Department's obligation under ICWA to send notice of the dependency and neglect proceeding to all Cherokee and Lakota Sioux tribes pursuant to section 19-1-126(1)(b).[5]  *A-J.A.B. I*, ¶ 9, 511 P.3d at 754.  The Department and A-J.A.B.'s guardian ad litem disagreed, maintaining that Mother provided insufficient information to trigger the notice obligation under section 19-1-126(1)(b) when the juvenile court was only provided vague assertions of tribal heritage without meaningful elaboration.  *Id.*

¶14    In a published opinion, the division agreed with Mother in part.  While it concluded that there was no reason to know A-J.A.B. was an Indian child, the division held that the juvenile court nevertheless erred by not directing the Department to exercise its separate due diligence obligation under section 19-1-126(3) to assist the court in determining whether there is reason to know that A-J.A.B. is an Indian child.  *Id.* at ¶ 10, 511 P.3d at 754.

¶15    The division explained that when a department initiates a dependency and neglect case, "Colorado's ICWA statute assumes the department has *already*

---

[5] "Cherokee" and "Lakota Sioux" are tribal ancestry groups, each comprising multiple specific tribes.  There are three Cherokee tribes in the United States, U.S. Dep't of the Interior, *Tribes: Cherokee Ancestry*, https://www.doi.gov/tribes/cherokee (last visited Aug. 25, 2023) [https://perma.cc/7JXW-N3DZ], and approximately sixteen Lakota Sioux tribes, *see* Indian Child Welfare Act; Designated Tribal Agents for Service of Notice, 76 Fed. Reg. 30438, 30475 (May 25, 2011).

*inquired* whether the subject child is an Indian child from available family members or available extended family members." *Id.* at ¶ 26, 511 P.3d at 756. This assumption follows from a department's obligation to disclose (1) if it has determined whether a child is an Indian child, and (2) if it "has not determined that the child is an Indian child," then it must "disclose 'in the complaint, petition, or other commencing pleading filed with the court' 'what *efforts*' it 'made in determining whether the child is an Indian child.'" *Id.* at ¶ 28, 511 P.3d at 756 (quoting § 19-1-126(1)(c)).

¶16 Next, the division examined Colorado's ICWA statute, which "requires the juvenile court to 'make inquiries to determine whether the child who is the subject of the proceeding is an Indian child.'" *Id.* at ¶ 30, 511 P.3d at 756 (quoting *People in Int. of K.C. v. K.C.*, 2021 CO 33, ¶ 46, 487 P.3d 263, 273). Critically, the division observed, the juvenile court "must ask each participant in a child-custody proceeding 'whether the participant knows or has *reason to know* that the child is an Indian child.'" *Id.* (emphasis added) (quoting § 19-1-126(1)(a)(I)(A)); *see also* 25 C.F.R. § 23.107(c) (2023).

¶17 Here, the division found that Mother's assertions of a possible affiliation with two tribal ancestral groups did not trigger the juvenile court to have reason to know that A-J.A.B. is an Indian child. *A-J.A.B. I*, ¶ 10, 511 P.3d at 754. But the division concluded that there can be circumstances—like those here—where the

10

court "receives information that the child may have Indian heritage but does not have sufficient information to determine that there is reason to know that the child is an Indian child." *Id.* at ¶ 56, 511 P.3d at 760 (quoting § 19-1-126(3)). In these instances, section 19-1-126(3) requires that "the court shall direct the petitioning . . . party to exercise due diligence in gathering additional information that would assist the court in determining whether there is reason to know that the child is an Indian child." § 19-1-126(3).

¶18　Because section 19-1-126(3) does not define what "due diligence" entails, the division crafted a three-step test which requires departments (1) to "earnestly inquire of any person disclosing possible Indian heritage to determine the basis of that person's belief or understanding"; (2) to recognize that "an assertion of possible Indian heritage may include multiple federally recognized tribes within an affiliated ancestral group . . . [and that] section 19-1-126(3) also requires the department to contact available family members and available extended family members and clarify what tribal ancestral group, and federally recognized tribes affiliated with the ancestral group, the parent or child might be affiliated with"; and then (3) based on "these inquiries, . . . to identify any other persons, agencies, organizations, or tribes that might have *additional* information about whether there is 'reason to know' the child is an Indian child." *A-J.A.B. I*, ¶¶ 61–63, 511 P.3d at 761. The division emphasized that the department may contact the tribe or tribes

11

within the identified ancestral group or groups to identify whether there is "reason to know" the parent or child is a member of any such tribe, noting that such contact may be necessary when there are no other sources of additional information. *Id.* at ¶ 64, 511 P.3d at 761.

¶19 In the event of such contact, the division indicated that the department should provide as much of the information required by 25 C.F.R. § 23.111(d) as possible to assist the tribes. *Id.* The division additionally recognized that, while the department is not required by section 19-1-126(3) to send notice to a tribe by registered or certified mail with return receipts requested, the department must be able to demonstrate on the record its efforts to determine whether there is reason to know that the child is an Indian child. *Id.* at ¶ 65, 511 P.3d at 761. Ultimately, the division concluded that, in assessing due diligence, the juvenile courts must remain mindful that it is a tribe's prerogative alone to determine who is and who is not a member, or eligible for membership, in the tribe. *Id.* at ¶ 66, 511 P.3d at 761; *see also* 25 C.F.R. § 23.108(b) (2023).

¶20 The division ordered a limited remand so that the Department could apply the appellate court's new three-step test. *Id.* at ¶¶ 82–90, 511 P.3d at 764–65.

¶21 On limited remand, the Department's caseworker tried to contact Mother using three different phone numbers, but Mother never returned any of the caseworker's calls. The caseworker also reached out to A-J.A.B.'s maternal

grandmother, who informed the caseworker that "the family did not have any Indian heritage." *People in Int. of A-J.A.B.*, No. 21CA764, ¶ 9 (Aug. 11, 2022) ("*A-J.A.B. II*"). She indicated that no member of the family had been to or lived on an Indian reservation. The child's maternal grandmother additionally signed a declaration of non-Indian heritage. Based on this record, the juvenile court found that the Department exercised its due diligence obligations under section 19-1-126(3) and concluded "that there was no reason to know that the child was an Indian child." *Id.*

¶22 Mother again appealed, arguing that the Department did not exercise due diligence because it did not send notice to or otherwise contact the tribes or the child's maternal great-aunt. The division affirmed, concluding that "the Department followed the remand instructions and that the record support[ed] the [juvenile] court's finding that the Department had exercised due diligence." *Id.* at ¶ 10. The division held that the Department satisfied its due diligence obligations by repeatedly trying to contact Mother and by successfully contacting A-J.A.B.'s maternal grandmother and obtaining a declaration of non-Indian heritage from her. Further, the division explained, the Department rightly concluded that its inquiries on limited remand did not lead to any "other persons, agencies, organizations, or tribes that might have additional information," meaning there were no other parties the Department ought to have contacted to satisfy its due

13

diligence obligation. *Id.* Accordingly, the division found that "ICWA does not apply in this case." *Id.* at ¶ 12. Mother sought certiorari review from this court, which we granted.[6]

## II. Analysis

¶23    We begin by explaining the standard of review before turning to the pertinent principles of statutory interpretation. Next, we examine the relevant federal and Colorado statutes and review our recent caselaw regarding ICWA and Colorado's implementing legislation. Then, we turn to the split between the published opinion below and another published court of appeals' decision regarding how to define due diligence under section 19-1-126(3). After that, we articulate the steps required for a department to fulfill its due diligence obligations under section 19-1-126(3).

### A. Standard of Review and Principles of Statutory Construction

¶24    We review questions of statutory interpretation de novo. *E.A.M.*, ¶ 39, 516 P.3d at 934. "This includes ICWA-related construction questions." *Id.* But we

---

[6] We granted certiorari to review the following issue:

  1. Whether the division erred in its analysis of C.R.S. § 19-1-126 and 25 C.F.R. § 23.107 in concluding that the Department had exercised due diligence in gathering information to determine whether the child was an Indian child when the Department failed to contact Native American tribes specifically identified by Mother through which she may have Native American heritage.

review a juvenile court's underlying factual findings for clear error. *V.K.L.*, ¶ 20, 512 P.3d at 139.

¶25 When interpreting statutes, we endeavor to effectuate the General Assembly's intent. *People v. Cali*, 2020 CO 20, ¶ 15, 459 P.3d 516, 519. In doing so, "we must 'consider the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts.'" *E.A.M.*, ¶ 40, 516 P.3d at 934 (quoting *K.C.*, ¶ 21, 487 P.3d at 269). We give the statute's words their plain and ordinary meaning and avoid interpretations that render words or provisions superfluous. *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 570-71 (Colo. 2008).

¶26 However, when interpreting statutes concerning Indian law, our "standard principles of statutory construction do not have their usual force." *E.A.M.*, ¶ 41, 516 P.3d at 934 (quoting *K.C.*, ¶ 22, 487 P.3d at 269); *accord Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). Rather, due to "the unique trust relationship between the United States and tribes, 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *V.K.L.*, ¶ 20, 512 P.3d at 139 (quoting *Blackfeet Tribe*, 471 U.S. at 766).

## B. Statutory Overview

¶27 Next, we examine ICWA's history as well as various federal regulations and guidelines relevant to this matter. We then consider Colorado's legislation

15

implementing ICWA, including section 19-1-126.  Against this backdrop, we turn our attention to the specific issue before us: defining due diligence as that phrase is used in section 19-1-126(3).

¶28    Congress enacted ICWA on the heels of the federal government's "Termination [E]ra" and its attempts to weaken tribal sovereignty.  Matthew L.M. Fletcher, *Federal Indian Law* § 3.10 (2016).  ICWA was a "direct response to the mass removal of Indian children from their families during the 1950s, 1960s, and 1970s." *Brackeen*, 143 S. Ct. at 1641 (Gorsuch, J., concurring); *see also* H.R. Rep. No. 95-1386, at 9 (1978) ("The wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian Life today."); *V.K.L.*, ¶¶ 21-25, 512 P.3d at 139-40.

¶29    When Congress passed ICWA, reports showed that up to 35% of all Indian children were being removed from their families and sent off-reservation to be fostered or adopted by non-Indian families.  Cohen, *supra*, § 11.01[2].  As one tribal leader explained, "Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People."  *Hearings on S. 1214 before the Subcomm. on Indian Affairs & Public Lands of the H. Comm. on Interior & Insular Affairs*, 95th Cong., 190, 193 (1978) (statement of Calvin Isaac, Tribal Chief & Member, Miss. Band of Choctaw

Indians & Nat'l Tribal Chairmen's Ass'n); *see also* 25 U.S.C. § 1901. ICWA was enacted to combat "[t]his 'wholesale removal of Indian children from their homes.'" *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 642 (2013) (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)).

¶30 ICWA lays out the "minimum Federal standards" for child-custody hearings that involve Indian children. 25 U.S.C. § 1902. Relevant here, this includes termination of parental-rights proceedings. 25 U.S.C. § 1903(1)(ii). ICWA instructs that when certain child-custody proceedings are initiated and the juvenile court "knows or has reason to know that an Indian child is involved," 25 U.S.C. § 1912(a), formal notice requirements are triggered, including notification obligations to the relevant tribe (or tribes) so that they may intervene in the custody proceedings or have the proceedings transferred to tribal court, *see id.*; 25 U.S.C. § 1911(b), (c); *see also K.C.*, ¶ 25, 487 P.3d at 269. To fulfill these obligations, the inquiry and notice provisions require petitioning parties and juvenile courts to inquire early and often whether a participant knows or has reason to know that the subject child is an Indian child. *See* Guidelines for Implementing the Indian Child Welfare Act, 81 Fed. Reg. 96476-01, at *11 (Dec. 30, 2016).

¶31 Under ICWA, an "Indian child" is defined as: "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible

17

for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).[7] "Eligibility alone, therefore, does not render a child an 'Indian child' under ICWA." *K.C.*, ¶ 24, 487 P.3d at 269. So too, Indian heritage on its own does not meet the statutory definition of "Indian child." *E.A.M.*, ¶ 46, 516 P.3d at 935.

¶32 "Notably, ICWA doesn't delineate tribal membership or eligibility for such membership." *Id.* at ¶ 15, 516 P.3d at 929. Rather, "membership is left to the province of each individual tribe." *People in Int. of K.R.*, 2020 COA 35, ¶ 6, 463 P.3d 336, 338; *see also* 25 C.F.R. § 23.108. But there is no uniform metric for assessing tribal membership across the hundreds of federally recognized tribes. *See People in Int. of A.G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995). So, in some instances, "a court may not possess the ability to discern membership or eligibility for membership in a particular tribe without a tribal determination." *E.A.M.*, ¶ 15, 516 P.3d at 929. And courts must be mindful "not [to] substitute [their] own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe." 25 C.F.R. § 23.108(b).

---

[7] ICWA's definition of an Indian child is one of political affiliation, not a racial based classification. *See* Conf. of W. Att'ys Gen., *American Indian Law Deskbook* § 13:7, Westlaw (database updated May 2023); *Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974).

¶33 To provide clearer guidelines for juvenile courts on when ICWA's notice provisions are applicable, Congress empowered the Department of the Interior to promulgate rules pertaining to ICWA. 25 U.S.C. § 1952. The federal Bureau of Indian Affairs ("BIA") has accordingly published rules and issued guidelines for state courts. *See* Guidelines for State Courts; Indian Child-Custody Proceedings, 44 Fed. Reg. 67584 (Nov. 26, 1979). And in 2002, the General Assembly "integrated ICWA into the Colorado Children's Code." *E.A.M.*, ¶ 13, 516 P.3d at 929; *see* Ch. 217, secs. 1, 3, § 19-1-126, 2002 Colo. Sess. Laws 782, 782–85. Notably, though, "the 1979 Guidelines were not regulations" and were simply that: guidelines. *E.A.M.*, ¶ 11, 516 P.3d at 928. Thus, they lacked binding legislative effect. *Id.*

¶34 It was not until 2016, some thirty-eight years after ICWA was first enacted, that the BIA promulgated federal regulations concerning ICWA. *See* Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38778 (June 14, 2016). "The federal regulations clarify some provisions in ICWA, including by defining key terms." *E.A.M.*, ¶ 11, 516 P.3d at 928. Six months later, the BIA also updated its 1979 Guidelines. *See* Guidelines for Implementing the Indian Child Welfare Act, 81 Fed. Reg. 96476-01 (Dec. 30, 2016). And while the 2016 Guidelines "are no more binding than their predecessors," this court has "embraced" them as an essential tool in interpreting and applying ICWA's provisions. *E.A.M.*, ¶ 12, 516 P.3d at 929.

19

¶35   Colorado's General Assembly enacted Colorado's ICWA statute in 2002, 2002 Colo. Sess. Laws at 783–85, and amended the statute in 2019 to align with the BIA's 2016 Guidelines, Ch. 305, sec. 1, 2019 Colo. Sess. Laws 2791, 2791. Colorado's ICWA statute mirrors ICWA's formal notice requirements and provides, among other things, that when a court "knows or has reason to know . . . that the child who is the subject of the proceeding is an Indian child," formal notice requirements are triggered. § 19-1-126(1)(b). So, as previously noted, regardless of whether a court knows or has reason to know that a child is an Indian child, the short-term effect is the same: "the court must treat the child as an Indian child throughout the proceeding unless and until it is determined on the record that the child does not meet the definition of an Indian child." *E.A.M.*, ¶ 25 n.3, 516 P.3d at 931 n.3.

¶36   But when does a court know or have reason to know that a child is an Indian child? The former is "fairly straightforward." *Id.* at ¶ 4, 516 P.3d at 927. "A court 'knows' that a child is an Indian child 'when made aware of the truth of this fact after a tribe or tribes have verified the child's membership, or verified the child's eligibility for membership through a biological parent's membership.'" *Id.* at ¶ 23 n.2, 516 P.3d at 931 n.2 (quoting *A-J.A.B. I*, ¶ 35, 511 P.3d at 757).

¶37   The answer to the more vexing question of when a court has *reason to know* whether a child is an Indian child in dependency and neglect cases is guided by

20

the six factors outlined in the BIA's 2016 Regulations, which are mirrored in section 19-1-126(1)(a)(II).  The six factors are:

> (1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;
>
> (2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;
>
> (3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;
>
> (4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;
>
> (5) The court is informed that the child is or has been a ward of a Tribal court; or
>
> (6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe.

25 C.F.R. § 23.107(c); *see* § 19-1-126(1)(a)(II) (incorporating the BIA's six factors into state law).

¶38   We explained in *E.A.M.* that "mere assertions of a child's Indian heritage (including those that specify a tribe or multiple tribes by name), without more, are not enough to give a juvenile court reason to know that the child is an Indian child."  ¶ 56, 516 P.3d at 937.  Importantly, however, that is not the end of the inquiry: "Instead, such assertions trigger the due diligence requirement in section 19-1-126(3)."  *Id.* at ¶ 6, 516 P.3d at 928.  This statutory provision, which

21

was enacted by the General Assembly in 2019, goes beyond the safeguards set forth in ICWA. So, if the juvenile court neither knows nor has reason to know that the child is an Indian child, but receives information that the child *may* be an Indian child, the court must direct the petitioning party to exercise due diligence in gathering additional information that would assist the court in determining if there is a reason to know that the child is an Indian child. § 19-1-126(3).

¶39    Section 19-1-126(3), which imposes this requirement, states that:

> If the court receives information that the child may have Indian heritage but does not have sufficient information to determine that there is reason to know that the child is an Indian child pursuant to subsection (1)(a)(II) of this section, the court shall direct the petitioning or filing party to exercise *due diligence* in gathering additional information that would assist the court in determining whether there is reason to know that the child is an Indian child.

(Emphasis added.) Another division of the court of appeals recently offered a competing definition of due diligence under this statute. *Compare A-J.A.B. I*, ¶ 51, 511 P.3d at 759–60, *with People in Int. of Jay.J.L.*, 2022 COA 43, ¶ 41, 514 P.3d 312, 320, *abrogated on other grounds by E.A.M.*, ¶ 56, 516 P.3d at 937. We first consider these different approaches and then explain what due diligence under section 19-1-126(3) requires.

## C. Competing Definitions of "Due Diligence"

¶40 We begin with a quick recap of the due diligence test crafted by the *A-J.A.B. I* division below. Then, we examine the alternative due diligence test articulated by the division in *Jay.J.L.*

¶41 Recall that the division below adopted a three-part test to define due diligence under section 19-1-126(3). *See A-J.A.B. I*, ¶¶ 60–63, 511 P.3d at 761. First, a department must "earnestly inquire of any person disclosing possible Indian heritage to determine the basis of that person's belief or understanding." *Id.* at ¶ 61, 511 P.3d at 761.

¶42 Second, the department must "contact available family members and available extended family members and clarify what tribal ancestral group, and federally recognized tribes affiliated with the ancestral group, the parent or child might be affiliated with." *Id.* at ¶ 62, 511 P.3d at 761.

¶43 And third, "from these inquiries, the department should be able to identify any other persons, agencies, organizations, or tribes that might have *additional* information about whether there is 'reason to know' the child is an Indian child." *Id.* at ¶ 63, 511 P.3d at 761. The division emphasized that tribal notification would not be necessary in each case but rather would depend on the specific facts presented. Specifically, the division wrote that a department

> may choose to contact the tribe or tribes within the identified ancestral
> group or groups to identify whether there is 'reason to know' the

23

parent or child is a member of any such tribe. . . . Such contact may be necessary when, for example, there are no other satisfactory sources of additional information. If the department makes this choice, [departments] should provide as much of the information required by 25 C.F.R. § 23.111(d) as possible to assist the tribes in determining whether there is 'reason to know' the child is an Indian child.

*Id.* at ¶ 64, 511 P.3d at 761.

¶44 The division in *Jay.J.L.* took a different approach. It first considered the ordinary meaning of due diligence before turning to other Colorado appellate authorities to define "due diligence." ¶ 37, 514 P.3d at 319. The *Jay.J.L.* division "agree[d] with the division in *A-J.A.B.* [*I*] that the record needs to establish that the department . . . earnestly endeavored to gather additional information that would assist the court in determining whether there is reason to know that the child is an Indian child." *Id.* at ¶ 38, 514 P.3d at 319. The *Jay.J.L.* division also agreed that "to meet this standard, the department must follow up with any parent who discloses Indian heritage to determine the basis of the parent's belief or understanding." *Id.*

¶45 However, the *Jay.J.L.* division disagreed with *A-J.A.B. I*'s specific requirement that a department must "contact available family members and determine whether they have additional information that would help the court determine whether the child is an Indian child." *Id.* at ¶ 39, 514 P.3d at 320. In the *Jay.J.L.* division's view, *A-J.A.B. I*'s test contradicts section 19-1-126(3) because it "enumerate[s] specific steps that a party must take to satisfy due diligence." *Id.* at

24

¶ 40, 514 P.3d at 320. But, the *Jay.J.L.* division explained, "[t]here is no objective, formulaic standard for determining what is, or is not, due diligence." *Id.* (alteration in original) (quoting *Owens v. Tergeson*, 2015 COA 164, ¶ 45, 363 P.3d 826, 836). Moreover, the division observed, due diligence does not necessarily require the party exercising it to actually succeed in its efforts or exhaust every possible option in attempting to do so. *Id.*

¶46 Given the unique nature of child-custody proceedings and the inapplicability of a rigid, formulaic standard, the *Jay.J.L.* division concluded that a determination of what constitutes due diligence needs to be "flexible and will necessarily depend on the circumstances of, and the information presented to the court in, each case." ¶ 41, 514 P.3d at 320.

¶47 Having surveyed the *A-J.A.B. I* and *Jay.J.L.* divisions' differing approaches, we now explain the proper inquiry for analyzing due diligence under section 19-1-126(3).

### D. Due Diligence Standard

¶48 Like the divisions in *A-J.A.B. I* and *Jay.J.L.*, we look to the dictionary and to the ordinary meaning of due diligence before turning to Colorado's ICWA-implementing statute and other Colorado appellate authorities to define due diligence under section 19-1-126(3).

¶49 Diligence is defined as "steady, earnest, and energetic effort: devoted and painstaking work and application to accomplish an undertaking." *Diligence,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ *diligence* [https://perma.cc/Q8GZ-KPS2]. Black's Law Dictionary refers to "due diligence" as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." *Due Diligence*, Black's Law Dictionary (11th ed. 2019).

¶50 Like the divisions, we too conclude that when a department learns that a child in a dependency and neglect case *may* be an Indian child, the department must earnestly endeavor to gather additional information that would assist the court in determining whether there is reason to know that the child is an Indian child.

¶51 But what additional information must a department gather to satisfy its due diligence obligation and to assist the court? Mother argues in her briefs that because tribes are the best sources of information regarding membership and eligibility for membership, due diligence necessarily requires *formal notice* to the tribes in every case in which a child may be an Indian child. Requiring formal notice in every such case would, in Mother's view, provide the best and most conclusive answer to the question of whether a child is a member of or eligible to be a member of a tribe. We disagree that this is what due diligence requires.

26

¶52 This is because Mother's approach to defining due diligence is at odds with ICWA and Colorado's broader statutory schemes. Her approach treats every case in which a child *may* be an Indian child under section 19-1-126(3) the same for notice purposes as those cases in which the court has *reason to know* that a child is an Indian child, section 19-1-126(1)(a)(II). However, general assertions of Indian heritage without more do not reach subsection 126(1)(a)(II)'s reason-to-know threshold. *See E.A.M.*, ¶ 56, 516 P.3d at 937. As a result, Mother's approach to defining due diligence essentially collapses this key distinction between subsections 126(1)(a)(II) and 126(3). This approach also completely disregards our holding in *E.A.M.* because it would necessarily require notice in some instances in which we have held that none is required. *See E.A.M.*, ¶ 27, 516 P.3d at 931.

¶53 Amicus Office of Respondent Parents' Counsel ("ORPC") and Mother's attorney also assert that tribes are the best source of information about who is an Indian child, and thus due diligence requires departments in every case in which a child may be an Indian child to *contact* the relevant Indian tribe or tribes, absent extenuating circumstances. We disagree that subsection 126(3) requires contact with a generally-identified tribe in *every* case in which a child may be an Indian child for three reasons.

¶54 First, the General Assembly could have required contact with tribes in section 19-1-126(3), and it is significant that it did not. Second, to the extent that

27

counsel uses the phrase "contact" with the tribes to mean notice by telephone, e-mail, or regular U.S. mail—as distinguished from the formal notice required by ICWA that must be sent by return-receipt requested mail—we are not persuaded that the method of delivering notice is what distinguishes subsections 126(1)(a)(II) and 126(3). And third, Mother and ORPCs' definitions of due diligence contradict section 19-1-126(3) because they both rigidly prescribe steps that a department must take in *every* case to satisfy its due diligence obligation. *See Owens,* ¶ 45, 363 P.3d at 836 (explaining there is no objective, formulaic standard for determining what is, or is not, due diligence); *Jay.J.L.,* ¶ 40, 514 P.3d at 320 (explaining how the due diligence test as articulated by the division in *A-J.A.B. I* is inconsistent with section 19-1-126(3) because it "enumerate[s] specific steps that a party must take to satisfy due diligence").

¶55     But due diligence, as that phrase is used in section 19-1-126(3), cannot be measured against a predetermined checklist of steps that a department must take in every case in which a child may be an Indian child. This is because general claims of Indian heritage can be asserted in a multitude of different ways, some of which are very specific and some of which don't go beyond vague assertions of general tribal membership. Due diligence in this context is a concept that logically must be flexible enough to allow the juvenile court to examine the thoroughness of a department's investigation into a general claim of Indian heritage based on

28

the specific circumstances of the claim before it. As a result, the determination of whether a department has exercised due diligence will necessarily vary with the specific circumstances of each case. *Cf. V.K.L.*, ¶ 32, 512 P.3d at 142 (recognizing that there can be "no one-size-fits-all formula" for defining what constitutes "active efforts" to assist an Indian family, as such efforts must be tailored to the specific facts and circumstances of the case).

¶56 This is why we disagree with *A-J.A.B. I*'s specific requirement that the department "contact available family members and available extended family members," and "from these inquiries . . . identify any other persons, agencies, organizations, or tribes that might have *additional* information about whether there is 'reason to know' the child is an Indian child." *A-J.A.B. I*, ¶¶ 62–63, 511 P.3d at 761. To be sure, there will be cases in which due diligence will require a department to contact many or all available family members to gather additional information. But just as certainly, there will be other cases in which this type of contact will not be required for a department to satisfy its due diligence obligation.

¶57 So, to summarize, due diligence, as it is used in section 19-1-126(3), requires the department to earnestly endeavor to investigate the basis for the parent or other participant's assertion that the child may be an Indian child, to contact those family members or others who are specifically identified as having knowledge regarding that assertion of general Indian heritage, and to learn whether

additional information exists that will help the court determine whether there is a reason to know that the child is an Indian child. *Cf. V.K.L.*, ¶ 33, 512 P.3d at 143 (instructing courts to consider the totality of the circumstances when reviewing whether an agency made "active efforts").

¶58 We emphasize that this flexible standard is not a de minimis or superficial one. We are mindful that the General Assembly's adoption of the due diligence standard in section 19-1-126(3) goes beyond the guardrails set forth in ICWA to protect the interests of Indian tribes and Indian children. To meet this standard, a department cannot just go through the motions after a party or participant claims general Indian heritage. It must ask questions: Why does the parent believe the family has the heritage asserted? Who is the *source* of that information? Due diligence then requires a department to follow up with the source of the information.[8] Those sources may identify additional persons with knowledge which may, in turn, require additional follow up. Due diligence does not, however, necessarily require the party exercising it to succeed in its efforts or exhaust every possible option in attempting to do so. Whether the department has

---

[8] For instance, if father indicates that he thinks he has Cherokee heritage, the department should ask father for the basis for that understanding. If father states that he was told this by his uncle, then the department should earnestly endeavor to follow up with that uncle to investigate and learn what he knows about the family's Cherokee heritage and specifically if father is a member of a Cherokee tribe.

satisfied its due diligence obligation in any case will ultimately be left to the sound discretion of the juvenile court, which necessarily requires the court to make credibility determinations regarding the source of the information and the basis for the source's knowledge.

¶59 Finally, after obtaining additional information necessary to satisfy due diligence, the petitioning party must then inform the juvenile court of its efforts and whether it believes the additional information rises to the level of reason to know under 25 C.F.R. § 23.107(c) and section 19-1-126(1)(a)(II). Based on that additional information, the juvenile court must determine (1) whether the petitioning party satisfied its statutory due diligence requirements and (2) whether the court now has reason to know that the child is an Indian child.

¶60 We now apply the proper test for satisfying subsection 126(3)'s due diligence requirement to the case at hand.

### E. Application

¶61 Prior to the first appeal, the Department appears to have engaged in little to no effort to gather additional information regarding the basis for Mother's understanding that she may have Cherokee and Lakota Sioux heritage. It was not the Department, but Mother's attorney who contacted the child's maternal grandmother and advised the court that the maternal grandmother said that the child's maternal great-aunt would be the best source for information about the

31

family's Indian heritage. The Department did not then follow up with either of them. As the division concluded in *A-J.A.B. I*, the Department's efforts before the first appeal fell far short of due diligence.

¶62 Following the limited remand, the Department attempted to follow up with Mother. Its caseworker tried contacting Mother using three different phone numbers, all to no avail. The Department also reached out to the child's maternal grandmother. She reported that there was no Native American heritage in the immediate family or in their family history that "they" were aware of, that no one in the family was a member of a tribe, and that no member of the family had been to or ever lived on a reservation. The child's maternal grandmother also signed a declaration of non-Indian heritage.

¶63 Mother argues that the Department's efforts fell short of due diligence because the Department never contacted A-J.A.B.'s maternal great-aunt, the person whom the child's maternal grandmother identified as the best source of information regarding the child's Indian heritage. Certainly, the better practice here would have been for the Department to attempt to contact A-J.A.B.'s maternal great-aunt, given that she was specifically named as the best source of information. But under the specific facts of this case, the Department did not need to do so to satisfy due diligence.

¶64 True, it does appear that the child's maternal grandmother may have changed her story. But these types of credibility determinations are precisely the types of decisions that juvenile courts are called upon to make every day. Here, the juvenile court may have determined that the maternal grandmother's second statement, which was more formal, more detailed, and made later in time, was more reliable than her original statement. Or the court may have construed the maternal grandmother's later statement, given its phrasing, as speaking to the family's knowledge—including that of A-J.A.B.'s maternal great-aunt. Of course, the juvenile court alternatively could have looked at this conflict and concluded that the Department had not exercised due diligence because it had not tried to contact the child's maternal great-aunt. In any event, we cannot conclude on this record that the division erred in concluding that the Department satisfied its due diligence obligation under section 19-1-126(3). And even if the Department erred, any error is harmless because we now know, definitively, that the child is not an Indian child.

¶65 Recall that Mother has never claimed tribal membership. To the contrary, Mother acknowledged that she probably would not qualify for tribal membership. Mother also never claimed that A-J.A.B. was eligible for membership in an Indian tribe. And if Mother was not a member of an Indian tribe (and here, Father had attested that he was not a member of an Indian tribe), then there is no way that the

33

child "is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

Put another way, here there was no reason to believe A-J.A.B. is an Indian child.

### III. Conclusion

¶66 Applying the standard set forth in section II.D. above, we conclude that the division did not err in determining that the Department satisfied its due diligence obligation under section 19-1-126(3). Accordingly, we affirm the division, albeit on different grounds.