25CA1539 Peo in Interest of ATGZKSB

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1539
Arapahoe County District Court No. 24JV166
Honorable Bonnie H. McLean, Judge

The People of the State of Colorado,

Appellee,

In the Interest of A.T.G.Z.K.S.B., a Child,

and Concerning O.D.M.B.,

Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE SCHUTZ
Freyre and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 22, 2026

Ron Carl, County Attorney, Kiley Schaumleffel, Assistant County Attorney, Aurora, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

Beth Padilla, Office or Respondent Parents' Counsel, Durango, Colorado, for Appellant

¶ 1    In this dependency and neglect action, O.D.M.B. (father) appeals the judgment terminating his parent-child legal relationship with A.T.G.Z.K.S.B. (the child). He initially contends that the juvenile court erred by finding that the Arapahoe County Department of Human Services (the Department) fulfilled its obligation to use due diligence in assessing whether the child was an Indian child subject to the Indian Child Welfare Act (ICWA). Father also contends that the juvenile court erred by finding that (1) he was an unfit parent and unlikely to become fit in a reasonable period of time; (2) there was no less drastic alternative to termination; and (3) termination was in the child's best interests. We consider, and reject, each claim in turn, and therefore affirm the judgment.

## I.    Background

¶ 2    The Department filed a petition in dependency and neglect alleging that the child tested positive for methamphetamine, fentanyl, amphetamine, methadone, and cocaine at birth. The juvenile court granted temporary custody of the child to the Department, which placed him in foster care, where he remained at the time of the termination hearing.

¶ 3    Father entered an admission, and the juvenile court adjudicated the child dependent and neglected and adopted a treatment plan for father.  The Department later moved to terminate father's parent-child legal relationship with the child.  The juvenile court granted the motion following a contested hearing.

## II.    Due Diligence Under ICWA

¶ 4    Father first claims that the juvenile court erred by finding that the Department exercised due diligence in assessing whether the child was an Indian child.  We disagree.

### A.    Standard of Review and Relevant Law

¶ 5    The provisions of ICWA and, by extension, the Colorado implementing statute, are aimed at the protection and preservation of Indian tribes and of Indian children who are members of or eligible for membership in an Indian tribe.  25 U.S.C. § 1901(2), (3).  To that end, ICWA requires the court to ensure that the petitioning party give notice of a dependency and neglect proceeding to any identified Indian tribes if the court "knows or has reason to know" that a child in the proceeding is an Indian child.  25 U.S.C. § 1912(a); § 19-1-126(1)(b), C.R.S. 2024 (amended and relocated

after the proceeding in this case to section 19-1.2-107(3)(d), C.R.S. 2025).

¶ 6    "[M]ere assertions of a child's Indian heritage (including those that specify a tribe or multiple tribes by name), without more, are not enough to give a juvenile court 'reason to know' that the child is an Indian child." *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶¶ 6, 48 (emphasizing that the statutory definition of "Indian child" applies based on the child's political ties to a federally recognized Indian tribe, not on the child's or her parents' Indian ancestry). Such assertions do not trigger ICWA's notice requirements, but rather the then applicable statutory due diligence requirements. *See* § 19-1-126(3); *H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶¶ 4-5. As contemplated by the statute in effect at the time of the termination hearing, due diligence requires a department to "earnestly endeavor to investigate the basis" for an assertion that the child may be an Indian child, contact any family members or others specifically identified by a parent as having knowledge of Indian heritage, and learn if there is further information that would help the court in determining if there is a reason to know that the child is an Indian child. *H.J.B.*, ¶ 57 (citing § 19-1-126(3)).

¶ 7    Under the then operative statute, whether the Department satisfied its due diligence obligation is ultimately left to the sound discretion of the juvenile court because it "necessarily requires the court to make credibility determinations regarding the source of the information and the basis for the source's knowledge." *Id.* at 58.

## B.    Analysis

¶ 8    The juvenile court found that the Department appropriately exercised due diligence after father reported potential Blackfoot or Cherokee heritage. The court ultimately found that the child was not an Indian child, ICWA did not apply, and the Department "exercised due diligence to do an exhaustive search in this case."

¶ 9    These findings are supported by the record. At the beginning of the case, father reported possible heritage with either the Blackfeet or Cherokee tribes. The Department sent formal notices to four tribes encompassed by this disclosure. At the time of the termination hearing, two tribes had responded and indicated that the child was not enrolled and not eligible for enrollment. Two tribes received but did not respond to the notices. All potential tribes were also sent notice of the termination hearing, but no tribe appeared at the termination hearing. The court conducted an ICWA

4

inquiry with father at the termination hearing, and father indicated he did not have any new information about heritage and confirmed that he was not enrolled in any tribe. No party, either at trial or on appeal, claims that the child was enrolled or eligible for enrollment in any tribe.

¶ 10    Father contends that the notice sent to the Blackfeet tribes "may have been insufficient" because the return receipt for notice to that tribe was stamped and not signed. But father does not provide any authority, and we are not aware of any, explaining why the official tribal stamp provided on the return receipt was not sufficient to demonstrate that the tribe received the notice sent by the Department.

¶ 11    Importantly, father does not claim that the notices sent by the Department were deficient in any way and does not explain what more the juvenile court should have done in its oversight of the Department's exercise of due diligence. Father correctly notes that the record does not reflect whether the Department contacted any family members before sending notices to the tribes that father indicated. But he also does not assert that he "specifically identified" any family who might have further information about his

claims of possible heritage. *See id.* at ¶ 57 (explaining that due diligence "requires the department . . . to contact those family members or others who are specifically identified as having knowledge regarding that assertion of general Indian heritage"). While the newly enacted Colorado ICWA statute includes other specific expectations to guide the court's determination of whether due diligence efforts were made, this statute was not yet in effect when the termination judgment was entered. *See* § 19-1.2-107(4)(b).

¶ 12     Given this record, we cannot say that the juvenile court abused its discretion by finding that the Department exercised due diligence in assessing whether the child was an Indian child.

### III.    Fitness

¶ 13     Father contends that the court erred by finding that he was unfit and unlikely to become fit within a reasonable period. We are not persuaded.

### A.    Applicable Law and Standard of Review

¶ 14     To terminate a parent-child legal relationship, clear and convincing evidence must establish, among other things, that the parent is unfit and that the conduct or condition rendering the

parent unfit is unlikely to change within a reasonable time.  § 19-3-604(1)(c)(II)-(III), C.R.S. 2025.  An unfit parent is one whose conduct or condition renders them "unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions."  § 19-3-604(2).

¶ 15    In determining whether a parent's conduct or condition is likely to change within a reasonable time, "the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition."  *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.  The court need not give a parent additional time, even when there has been recent progress on the treatment plan. *Id.* at ¶¶ 24, 28-29.

¶ 16    What constitutes a reasonable time is fact specific and must be determined by considering the physical, mental, and emotional conditions and needs of the child.  *Id.* at ¶ 25.  When, as here, a child is under six years old at the time of the filing of the petition, the action is subject to the expedited permanency planning provisions, and the court must consider the child's need to be

placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2025. A juvenile court's findings and conclusions as to unfitness will not be disturbed on review if the record supports them. *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

## B. Analysis

¶ 17 Father first contends that he was in substantial compliance with his treatment plan. The juvenile court acknowledged that father had "checked many of the boxes on his treatment plan." However, the court found that father was not in substantial compliance because he remained unable to meet the child's physical, mental, and emotional needs. Specifically, the court found "father hasn't been able to show that he's putting the child's needs first, because he hasn't been able to establish safe and appropriate boundaries in his relationship with respondent mother in this case." In other words, as the juvenile court explained, "the biggest issue" at termination remained father's "inability to be a safe protective parent."

¶ 18 This finding is supported by the record. Father testified that he understood he was "supposed to . . . be more protective" but

admitted that he would not tell mother that she couldn't participate in family time when she was under the influence. Father testified that he knew that mother was actively using substances, and he admitted that she was still residing in his home. The caseworker testified that father often brought mother to family time with the child, even when she was actively under the influence.

¶ 19 The caseworker, who the court qualified as an expert in casework with an emphasis in child protection, opined that father's lack of protective parenting remained "the major concern" for the Department. She testified that, during the case, father said that he would not allow mother to live in his home while she was using substances, but father did not follow through with those commitments. The caseworker expressed concerns that father would continue to allow mother to "come into the home and put the child at risk with substances within the home." She opined that "there was a high risk" because father "has not demonstrated his ability to be protective [of the child] and not allow [mother] in the home." A parent who chooses to remain in a relationship with someone who poses a threat to the child's welfare may be deemed unfit if such conduct prevents the parent from providing adequate

protection. *People in Interest of C.T.S.*, 140 P.3d 332, 334 (Colo. App. 2006); *see also People in Interest of A.N-B.*, 2019 COA 46, ¶ 30 (when a parent does not recognize the danger that the other parent poses to the children, the court can properly find that the parent has not resolved protective concerns addressed in the treatment plan).

¶ 20    Next, father argues that the Department "moved the goalposts" by asking for substance testing and parenting classes not included in the treatment plan and expecting father's protective capacity to improve without including any specific service to address that concern.  We agree that the Department appears to have improperly added a substance testing requirement that was unsupported by the treatment plan approved by the court.  But it is clear from the termination judgment that the court did not rely upon any concern the Department may have had for father's sobriety.  In fact, the termination judgment does not mention any concern about father's alleged substance use.

¶ 21    Nor are we persuaded that father's treatment plan was insufficient to address the protective parenting concerns.  The treatment plan required father to attend parenting classes.  He

successfully completed both Circle of Parents and The Fatherhood Program. The juvenile court found that, while father completed the programs, "the issue is that he's not able, then, to take the lessons and the information that he's learned and apply that to his relationship to the minor child" and to mother. Father testified that the two courses helped him understand how to be "more of a protective parent." But father agreed that he struggled to maintain boundaries with mother and "wasn't going to keep [mother] away from" the child. We cannot discern, and father does not suggest, what more could have been added to the treatment plan that would have assisted him with implementing the protective parenting skills covered in the courses he took.

¶ 22 Finally, father argues that if he was unfit, he could become fit within a reasonable time. The juvenile court found that father was unlikely to become fit within a reasonable time because he "has still not made any progress in addressing the . . . protective and safe parenting issues here." Although the court made clear throughout the case that father's protective parenting was "the big issue," it noted that father "hasn't done anything about it" and that he had more than a year to address it. The record supports this finding.

Mother was still using substances while she resided in father's home, despite father's stated intentions to ask her to leave. While the court expressed sympathy for the difficult position that father was in, it made clear that fitness required him "to show that he's putting the child's needs first."

¶ 23     We therefore discern no error in the court's finding that father was not fit and was not likely to become fit within a reasonable period of time.

IV.     Issues Pertaining to the Child's Placement

¶ 24     Father also contends that the juvenile court erred by finding that there was no less drastic alternative to termination because the Department failed to investigate a reasonable number of relative placements. However, we will not address this contention because father did not properly preserve this issue for appeal. Father claims that this issue was preserved because he requested placement with a family member and "the issue of relative placement was discussed throughout the case." But discussing potential placements for the child during the case is not the same as preserving a less drastic alternative claim. *See People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004) (While "[w]e do not require that parties use 'talismanic

language' to preserve particular arguments for appeal, . . . the trial court must be presented with an adequate opportunity to make findings of fact and conclusions of law on any issue before we will review it." (citations omitted)).  Here, father did not present any argument during the termination hearing regarding the Department's exploration of family or kin placements for the child.  And importantly, the issue of where a child will be placed is distinct from whether a particular legal disposition would appropriately serve as a less drastic alternative to termination.  *People in Interest of H.L.B.*, 2025 COA 86, ¶ 22 ("[A] less drastic alternative to termination is not dependent on a particular out-of-home placement provider.").

¶ 25     Father also contends that the court erred by finding that termination was in the child's best interest because the child was not in a permanent home at the time of the termination hearing.  The Department and the child's guardian ad litem contend that this fact, while made apparent by a change of placement after the judgment was issued, was not known to the juvenile court.  But our review of the record makes clear that the parties and the court believed a placement disruption for the child was likely.  The

caseworker testified that she had recently notified all the parties that the child's placement provider was no longer a permanent placement option. The caseworker also testified that she was planning to reach out to a family member that father suggested for placement after the termination hearing, regardless of the outcome, because a change of placement was "still a possibility."

¶ 26 Importantly, the juvenile court acknowledged that the child's placement provider at the time of the termination hearing was not "a for sure adoptive home." Nevertheless, the court found that "whether [the child's placement provider] is kin or this foster family or a different foster family . . . , [i]t is in his best interest to have parental rights terminated." This finding is supported both by the record and case law. *Id.* at ¶ 20 ("[W]hen a court concludes that termination is in a child's best interests . . . the child does not need to be in a potentially adoptive home, nor do we require that a specific adoptive placement be identified or known to the court at the time of termination.").

¶ 27 Father also contends that termination was not in the child's best interests because father knew how to care for him and was safe and appropriate during supervised family time. True, father

14

attended supervised family time and demonstrated that he loved the child, the child responded positively to him, and father knew how to provide many basic needs such as feeding, diapering, and playing. However, as discussed above, the juvenile court found that the child also needed father to protect him from mother's substance dependence, something that father proved unable to do. *See People in Interest of A.R.*, 2012 COA 195M, ¶ 38 (whether an ongoing relationship with a parent would be beneficial or detrimental to a child is "influenced by a parent's fitness to care for [the] child's needs"). When the evidence conflicts, a reviewing court may not reweigh it or substitute its judgment for the juvenile court's judgment merely because there might be evidence supporting a different result. *See People in Interest of A.J.L.*, 243 P.3d 244, 256 (Colo. 2010).

¶ 28    We therefore discern no basis for reversal.

<h2 style="text-align:center">V.    Conclusion</h2>

¶ 29    The judgment is affirmed.

JUDGE FREYRE and JUDGE BROWN concur.