24CA0936 Peo in Interest of JJN 02-27-2025

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 24CA0936
Mesa County District Court No. 22JV48
Honorable Brian J. Flynn, Judge

_____

The People of the State of Colorado,

Appellee,

In the Interest of J.J.N., a Child,

and Concerning M.M.N.,

Appellant.

_____

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Kuhn and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 27, 2025

_____

Todd Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand
Junction, Colorado, for Appellee

Jenna L. Mazzucca, Counsel for Youth, Salida, Colorado, for J.J.N.

Ainsley E. Bochniak, Office of Respondent Parents' Counsel, Denver, Colorado,
for Appellant

¶ 1　　In this dependency and neglect action, M.M.N. (mother) appeals the judgment terminating her parent-child legal relationship with J.J.N. (the youth). We affirm.

## I.　Background

¶ 2　　In 2019, Mesa County School District 51 filed a truancy case against the then-six-year-old youth. Mother engaged minimally in the truancy case. In 2021, the truancy court ordered the Mesa County Department of Human Services to conduct an assessment pursuant to section 19-3-501, C.R.S. 2024 (allowing an agency designated by the court to "make a preliminary investigation to determine whether the interests of the child or of the community require that further action be taken" by filing a petition in dependency and neglect). However, the caseworker assigned reported that she was unable to complete the assessment because mother refused to cooperate.

¶ 3　　Throughout 2021 and 2022, the Department received numerous referrals raising concerns that the youth's basic needs weren't being met and that he wasn't attending school despite orders entered in the truancy case. In 2022, mother was arrested, and the Department filed a petition in dependency and neglect,

alleging that mother wasn't available to parent the youth because of her arrest and expressing concern about mother's mental health and ongoing educational neglect of the youth.

¶ 4 The juvenile court adjudicated the youth dependent and neglected and adopted a treatment plan for mother. The treatment plan required mother to participate in family time and attend a parenting class, address her mental health and substance dependence, maintain safe and stable housing, complete a capacity to parent evaluation, engage in life skills services, and comply with her ongoing criminal matters. The treatment plan was later amended to include a "neuro-psychological evaluation."

¶ 5 In 2023, the Department moved to terminate mother's parental rights. In April 2024, more than two years after the petition was filed, the juvenile court granted the motion following a contested hearing.

## II. The Indian Child Welfare Act

¶ 6 Mother first contends that the juvenile court erred by finding that the Department complied with the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§ 1901-1963. We aren't persuaded.

A.    Standard of Review and Applicable Law

¶ 7    ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. The juvenile court "must ask the participants on the record at the commencement of every 'proceeding' whether they know or have reason to know that the child is an Indian child." *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 21 (citing 25 C.F.R. § 23.107(a) and § 19-1-126(1)(a)(I)(A), C.R.S. 2024). A "child-custody proceeding" does not encompass every hearing held by the juvenile court, and a single proceeding can span multiple hearings. 25 C.F.R. § 23.2. As relevant here, a non-emergency action that may result in a child's placement in foster care or the termination of parental rights is a "child-custody proceeding." *Id.*; C.R. ICWA P. 1(b)(3).

¶ 8    The Children's Code imposes an additional "due diligence" obligation on a department to "earnestly endeavor to investigate" when there is an "assertion of general Indian heritage." *People in Interest of H.J.B. v. A-J.A.B.*, 2023 CO 48, ¶ 57; *see* § 19-1-126(3).

3

¶ 9 Whether the procedural and substantive aspects of ICWA have been satisfied presents a mixed question of fact and law. *Cf. People in Interest of O.S-H.*, 2021 COA 130, ¶ 15. We review the factual findings for clear error, and the legal conclusions de novo. *Id.* Determining whether a department has satisfied its due diligence obligations under ICWA, "will ultimately be left to the sound discretion of the juvenile court, which necessarily requires the court to make credibility determinations regarding the source of the information and the basis for the source's knowledge." *H.J.B.*, ¶ 58.

## B. Additional Background

¶ 10 Father appeared at the shelter hearing in February 2022 and, in response to the juvenile's court's ICWA inquiry, reported "some Native American on [his] dad's side." The shelter hearing was continued and father didn't appear at the next hearing, or at any subsequent hearing until the termination hearing. Mother appeared and, in response to the court's ICWA inquiry, denied any Native American Heritage. Mother also completed a "declaration of non-Indian heritage."

¶ 11 In October 2022, a paternal aunt signed and the department filed with the court a "declaration of non-Indian heritage."

4

¶ 12    The juvenile court didn't make any ICWA inquiries on the record again until February 2024, when maternal grandmother appeared and denied Native American Heritage.  The court also inquired at the beginning of the termination hearing in April 2024.  Mother denied that she had any new information.  Father reiterated his first disclosure that "there is some Native American heritage on his father's side out of New Mexico with the Apache Tribe" and reported that an aunt who had earlier signed the declaration of non-Indian heritage had investigated the possible heritage.

### C.    Analysis

¶ 13    Mother first contends that the Department failed to comply with ICWA because it didn't send notices to all Apache Tribes before the termination hearing.  However, our review of the record confirms the juvenile court's finding that there was no reason to know that the child was an Indian child.  Therefore, the Department didn't have an obligation to provide notices of the termination hearing to any tribe.  *E.A.M.*, ¶¶ 20, 56 (holding that assertions of Native American heritage alone aren't enough to give a court "reason to know," and the Department has an obligation to provide

5

notice of the proceedings only when the court "knows or has reason to know" that a child is an Indian child).

¶ 14    Next, mother contends that the juvenile court should have made ICWA inquires on the record at each hearing. Although doing so may have been best practice, ICWA requires an inquiry "at the commencement of the *proceeding*" as narrowly defined in the statute, not at the beginning of every hearing. § 19-1-126(1)(a)(I)(A) (emphasis added); *see also* 25 C.F.R. § 23.2. ("Within each child-custody proceeding, there may be several hearings.").

¶ 15    Finally, mother contends that the juvenile court erred in finding that the Department satisfied its "due diligence" obligations under section 19-1-126(3). The court found, with record support, that "the requirements of [ICWA] have been complied with." The first caseworker testified that she reached out to father after his disclosure at the shelter hearing, but he hung up after she introduced herself and then stopped answering her calls altogether. The caseworker continued to reach out to father twice a month but he never responded, so she contacted paternal family members located independently by the Department. The caseworker identified a paternal aunt, who was involved in researching the

family's Native American history. As noted above, in October 2022, the paternal aunt signed a declaration of non-Indian heritage. When the first caseworker located father in custody in August 2023, she provided him with additional ICWA forms, but nothing further was filed with the court by him or on his behalf. The second caseworker testified that she also reached out regularly to paternal family members to get information but never successfully reached anyone.

¶ 16 Due diligence doesn't "necessarily require the party exercising it to succeed in its efforts or exhaust every possible option in attempting to do so." *H.J.B.*, ¶ 58. Because there is ample record support for the juvenile court's finding that the Department complied with requirements under ICWA, we won't disturb it.

### III. Reasonable Efforts

¶ 17 Mother next contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate her. We aren't persuaded.

#### A. Applicable Law and Standard of Review

¶ 18 Before the juvenile court may terminate parental rights under section 19-3-604(1)(c), C.R.S. 2024, a department must make

reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. Reasonable efforts means the "exercise of diligence and care" for a child who is in out-of-home placement, and the reasonable efforts standard is satisfied when appropriate services are provided in accordance with section 19-3-208. § 19-1-103(114). Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b).

¶ 19 The juvenile court should consider whether the provided services were appropriate to support the parent's treatment plan. *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). The parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

¶ 20 Whether a department satisfied its obligation to make reasonable efforts to reunify the family is a mixed question of fact and law. We review the juvenile court's factual findings related to

8

reasonable efforts for clear error but review de novo the court's legal determination, based on those findings, as to whether a department satisfied its reasonable efforts obligation. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

### B. Analysis

¶ 21 As a preliminary matter, mother contends that the juvenile court erred by failing to make explicit reasonable efforts findings in its judgment terminating her parental rights. But a "[f]ailure of the court to make express findings, on its own, does not establish a failure by the court to ensure that the Department made reasonable efforts." *Id.* at ¶ 15. And here, it's clear that the court conducted a reasonable efforts analysis. In the same paragraph where the court explicitly found that the Department made reasonable efforts as to father, the court made detailed findings about mother's lack of participation in services and support offered by the Department. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12 (the court may consider a parent's unwillingness to participate in treatment when determining whether a department made reasonable efforts).

¶ 22 Next, mother contends that the Department failed to make reasonable efforts to "assist [her] with complying with the treatment

plan." But mother provides no legal authority for her contention that the Department had any obligation to "make reasonable efforts to accommodate mother's deficiencies." Notably, mother never asked the juvenile court to determine if she was a qualified individual under the Americans with Disabilities Act (ADA), and likewise stops short now of claiming she was entitled to reasonable accommodations under the ADA. *See* 42 U.S.C. § 12102 (defining "disability" under the ADA); *see also* 42 U.S.C. § 12131(2) (defining "qualified individual" under the ADA).

¶ 23     Although both caseworkers received information that mother may have a traumatic brain injury, mother adamantly denied the diagnosis. At the termination hearing, the second caseworker testified that she spoke with mother and maternal grandmother about services available to support persons with traumatic brain injuries and "after having that conversation with [mother] and her mom, [she] had no reason to believe that [mother] had a traumatic brain injury or any sort of disability."

¶ 24     In any event, the record reflects that the Department made timely — and often multiple — referrals for family time, mental health and substance dependence assessments, life skills,

substance monitoring, a capacity to parent evaluation that included a psychological evaluation, and a neuro-psychological evaluation. These services were appropriate to support the treatment plan, and the juvenile court did not err by concluding that the Department satisfied its reasonable efforts obligation by making them available. *See S.N-V.*, 300 P.3d at 915.

¶ 25 Mother's failure to follow through with these services was properly considered by the court and likewise supports the juvenile court's determination that the Department made reasonable efforts to rehabilitate mother. *A.V.*, ¶ 12.

¶ 26 Mother also contends that reasonable efforts weren't made because the youth wasn't in a permanent home at the time of the termination hearing. But mother doesn't provide, and we aren't aware of, any legal authority which requires a child or youth to be in a permanent home before a termination of parental rights can be granted. Certainly, the Department has an obligation to the youth to make reasonable efforts to "find a safe and stable permanent home" and finalize the youth's permanency goal. § 19-3-702(3), (3)(b). But those reasonable efforts obligations are to the youth and are distinct from the "reasonable efforts . . . unable to rehabilitate

the parent" that must be considered by the juvenile court when "determining unfitness, conduct, or condition for purposes of" section 19-3-604(1)(c). § 19-3-604(2)(h).

IV.     More Time as a Less Drastic Alternative

¶ 27     Last, mother contends that the juvenile court erred by finding there was no less drastic alternative to termination because it could have given her additional time to engage in her treatment plan. In his answer, counsel for the youth and the department urge us to consider the record support for the juvenile court's findings that it would have been inappropriate to give mother additional time.

¶ 28     The juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. In considering less drastic alternatives, the court must base its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3). The court may also consider whether an ongoing relationship with the parent would be beneficial or detrimental to the child. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38. This

determination is "influenced by a parent's fitness to care for [the] child's needs." *Id.*

¶ 29 Here, the juvenile court specifically considered and rejected giving mother more time. The court found it was "essential to [the youth]'s well-being that he be in a permanent home as soon as possible so that he can continue to thrive." The court also found that any alternative to a permanent placement was "clearly not in [the youth]'s best interests," as it posed the risk of disruption. Therefore, the court found that there was no less drastic alternative to termination available.

¶ 30 The record supports these findings. The youth was bonded to mother and the second caseworker testified that mother was a "really good support" for the youth. However, the caseworker, an expert in child protection, went on to opine "that's different from being able to take care of an eleven, almost twelve-year-old boy who has higher education needs, higher mental health needs. And [mother] cannot do that." While the caseworker supported some kind of ongoing contact between the youth and mother, she testified that "doing fun things with your kid is totally different than being able to parent your kid," and mother wasn't able to provide

minimally adequate parenting, even two years into the case. Both caseworkers emphasized the negative impact that uncertainty was having on the youth and observed that staying in the "limbo unknown state" caused anxiety and confusion for the youth.

¶ 31 That the youth was at least six months away from being placed in a permanent home doesn't vitiate the court's finding that affording mother more time was a viable less drastic alternative. When asked about giving mother more time, the second caseworker testified "we've already been in this for two years, which is longer than it should be, in my opinion. And trying to give [mother] more time where there's the same issues, it's starting from square one . . . . [W]e're in exactly the same place with the exact same concerns that we were two years ago. It's not appropriate for [the youth] and his permanency needs." This supports the juvenile court's conclusion that giving mother additional time — even in light of the time it will take to place the youth in a permanent home — isn't a viable less drastic alternative that serves the youth's best interest.

¶ 32 The record therefore supports the juvenile court's findings regarding less drastic alternatives. Accordingly, the court didn't err

14

by concluding that the child's best interests were served by terminating the parent-child relationship.

## V. Disposition

¶ 33    The judgment is affirmed.

JUDGE KUHN and JUDGE SCHUTZ concur.