24CA0102 Peo in Interest of MB 05-01-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0102
Arapahoe County District Court No. 21JV709
Honorable Bonnie H. Mclean, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of M.B. and A.B., Children,

and Concerning L.B.,

Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Kuhn and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 1, 2025

---

Ron Carl, County Attorney, Sarah Simchowitz, Assistant County Attorney, Aurora, Colorado, for Appellee

Sheena Knight, Counsel for Youth, Brighton, Colorado, for M.B. and A.B.

Gregory Lansky, Office of Respondent Parents' Counsel, Aurora, Colorado, for Appellant

¶ 1     In this dependency and neglect action, L.B. (father) appeals the judgment terminating his parent-child legal relationships with M.B. and A.B. (the youths).  We affirm.

I.     Background

¶ 2     The Arapahoe County Department of Human Services filed a petition in dependency and neglect alleging that K.S. (mother) left the youths with the maternal grandmother in Colorado after fleeing the state of Alabama to avoid ongoing involvement with child protective services there.  The Department alleged concerns about mother's substance dependence and ability to provide for the emotional and physical needs of the youths, who were eleven and thirteen at that time.  The Department also alleged that the maternal grandmother was estranged from mother, didn't have a relationship with either youth, and couldn't provide ongoing placement to the youths.

¶ 3     After establishing jurisdiction under the Uniform Child-custody Jurisdiction and Enforcement Act (UCCJEA), the juvenile court adjudicated the youths dependent and neglected and adopted treatment plans for both parents.

¶ 4     The Department later moved to terminate both parents'
parental rights.  The youths both supported the termination
motion.  Nearly two years after the petition was filed, the juvenile
court terminated mother's and father's rights following a contested
hearing.  Mother never appeared or participated in the dependency
action and isn't a party to this appeal.

## II.     Subject Matter Jurisdiction

¶ 5     Father first contends that the juvenile court lacked subject
matter jurisdiction under the UCCJEA.  We disagree.

### A.     Standard of Review and Relevant Law

¶ 6     We review de novo whether the juvenile court had subject
matter jurisdiction under the UCCJEA.  *People in Interest of B.H.*,
2021 CO 39, ¶ 27.  When a juvenile court makes factual findings
informing the determination of jurisdiction, we defer to such
findings unless they are clearly erroneous.  *People in Interest of
S.A.G.*, 2021 CO 38, ¶ 21.

¶ 7     "The primary aim of the UCCJEA is to prevent competing and
conflicting custody orders by courts in different jurisdictions" and
to "avoid jurisdictional competition over child-custody matters in an
increasingly mobile society."  *People in Interest of M.M.V.*, 2020 COA

2

94, ¶ 17. "To effectuate this purpose, [the UCCJEA] establishes a comprehensive framework that a Colorado court must follow to determine whether it may exercise jurisdiction in a child-custody matter or whether it must defer to a court of another state." *Id.*

¶ 8    A juvenile court may exercise temporary emergency jurisdiction when "necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse." § 14-13-204(1), C.R.S. 2024. Temporary emergency jurisdiction is limited in time and scope, and "continues 'only for as long as the emergency exists' or the child remains abandoned." *S.A.G.,* ¶ 30 (citations omitted).

¶ 9    A court may not terminate parental rights while exercising temporary emergency jurisdiction unless it finds there is a continuing abandonment or emergency. *Id.* at ¶ 35. To otherwise enter a permanent custody disposition, a juvenile court must assert non-emergency jurisdiction. *Id.* at ¶ 26.

¶ 10    When there is an existing child-custody determination made by another state, as was the case here, the relevant non-emergency jurisdiction that a juvenile court in Colorado may pursue is modification jurisdiction. § 14-13-207, C.R.S. 2024. To obtain

modification jurisdiction, the court must determine that it has either home state or significant connection jurisdiction and (1) a court of the other state determines it no longer has exclusive, continuing jurisdiction under that state's law in conformity with section 14-13-202; (2) a court of the other state determines that a Colorado court would be a more convenient forum under that state's law in conformity with section 14-13-207; or (3) a court of either state determines that the child and the child's parents do not reside in the other state. § 14-13-203, C.R.S. 2024; *see also B.H.*, ¶¶ 29-33. A Colorado court must communicate with the other state before obtaining non-emergency jurisdiction and modifying the existing child-custody determination. *People in Interest of C.L.T.*, 2017 COA 119, ¶ 23.

¶ 11     Termination of parental rights isn't a new child-custody proceeding that requires the juvenile court to re-assess its jurisdiction under the UCCJEA. *S.A.G.,* ¶ 39 n.3 ("[I]n Colorado, a motion to terminate parental rights after a child has been adjudicated dependent and neglected is a request for a remedy, not the start of a second proceeding." (citing § 19-3-502(3)(a), C.R.S. 2021)). Thus, if a court properly obtained modification jurisdiction

prior to entering adjudications, it need not re-assess jurisdiction under the UCCJEA before entering a termination judgment. *Id.*

## B. Additional Background

¶ 12 At the shelter hearing, father reported that there was a child-custody determination made in Indiana as part of his and mother's dissolution of marriage. Father later asserted that after the child-custody determination was made, the youths resided in Alabama with mother between 2013 and 2018, in Florida with father between 2018 and 2020, and in Alabama with mother between 2020 and 2021. In the fall of 2021, human services in Alabama became involved with the family and opened a child-protection investigation. Mother brought the youths to Colorado and left them with her estranged mother in December 2021. The petition was filed just a few days later. At that time, father reported that he lived in South Carolina.

¶ 13 The juvenile court exercised emergency temporary jurisdiction at the shelter hearing and regularly reviewed and renewed the emergency temporary jurisdiction while actively working to resolve the jurisdictional issue.

¶ 14     Based on information provided by the parties, the juvenile court then communicated, or attempted to communicate, with judicial officers from four states: Indiana, Florida, Alabama, and South Carolina.  The court initially issued an order under the UCCJEA reporting on the results of the four UCCJEA conferences and finding that each state had deferred jurisdiction to Colorado.  The court found that the youths had not resided in Colorado for 182 days and that there was an out-of-state custody determination.  But the first UCCJEA order also had a box checked finding, in contradiction with its other findings, that Colorado was the youths' home state.  *See* § 14-13-201(1)(a) (designating "home state" as the state in which a child lived with a parent or a person acting as a parent for at least 182 consecutive days immediately before the commencement of a child-custody proceeding).

¶ 15     Father then moved to dismiss for lack of jurisdiction under the UCCJEA, the Department and youths' GAL responded, and father provided an offer of proof with the timeline of the youths' residences.  Through pleadings, all parties agreed that Colorado couldn't properly be found to be the home state of either youth as stated in the first UCCJEA order.

6

¶ 16    The juvenile court issued a second UCCJEA order, finding that "all relevant states have been contacted and all have declined to take jurisdiction" and determining that Colorado had significant connection and most convenient forum jurisdiction.

## C.    Analysis

¶ 17    Father first contends that the juvenile court erred because it couldn't properly exercise emergency jurisdiction at the time of the termination hearing.  Because the court didn't purport to be exercising temporary emergency jurisdiction at that time, we don't address this contention.

¶ 18    Relying on *S.A.G.*, Father next asserts that the juvenile court was required, and failed, to determine whether any state had home state jurisdiction.  But father's reliance on *S.A.G.* is misplaced.  In *S.A.G.*, the juvenile court was required to "navigate one of the four paths to jurisdiction from section 14-13-201(1)" because there were no prior child-custody determinations.  *S.A.G.*, ¶¶ 14, 26; *see* § 14-13-202.  Instead the Colorado Supreme Court opinion in *B.H.* controls cases like this one where there are, or might be, child-custody determinations establishing exclusive, continuing jurisdiction with another state.  *B.H.*, ¶ 3.  In such cases, the

juvenile court is required to obtain modification jurisdiction as described in section 14-13-203.  *Id.* at ¶¶ 3, 29-33.

¶ 19     Here, the court properly recognized that there was a prior custody determination in Indiana.  The court found that Colorado had significant connection jurisdiction, conferred with an appropriate judicial officer in Indiana, and reported to the parties that the Indiana court declined to continue its jurisdiction.  Father doesn't appear to challenge the juvenile court's communication with Indiana, or its findings supporting modification jurisdiction under section 14-13-203.

¶ 20     Because the court didn't need to confer with the other states where the children may have resided after Indiana entered a child-custody determination, we decline to address father's contentions related to those conferences.

### III.     Due Diligence Regarding Potential Indian Heritage

¶ 21     Father next contends that the juvenile court erred by failing to make findings related to the Department's due diligence requirement under section 19-1-126, C.R.S. 2024, Colorado's statute implementing the Indian Child Welfare Act (ICWA).  We conclude that any error is harmless.

8

### A.    Standard of Review and Relevant Law

¶ 22    ICWA's provisions and, by extension, the Colorado implementing statute, are aimed at the protection and preservation of Indian tribes and of children who are members of or eligible for membership in an Indian tribe.  25 U.S.C. § 1901(2), (3).

¶ 23    To that end, ICWA requires the court to ensure that the petitioning party give notice of a dependency and neglect proceeding to any identified Indian tribes if the court "knows or has reason to know" that a child in the proceeding is an Indian child.  25 U.S.C. § 1912(a); § 19-1-126(1)(b).

¶ 24    "[M]ere assertions of a child's Indian heritage (including those that specify a tribe or multiple tribes by name), without more, are not enough to give a juvenile court 'reason to know' that the child is an Indian child." *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶¶ 6, 48 (emphasizing that the statutory definition of "Indian child" applies based on the child's political ties to a federally recognized Indian tribe, not on the child's or her parents' Indian ancestry).

¶ 25    Such assertions don't trigger provisions in ICWA, but rather the statutory due diligence requirements in section 19-1-126(3). *H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶ 5.  Due

diligence requires a department to "earnestly endeavor to investigate the basis" for an assertion that the child may be an Indian child, contact any family members or others specifically identified by a parent as having knowledge of Indian heritage, and learn if there is further information that would help the court in determining if there is a reason to know that the child is an Indian child. *Id.* at ¶ 57. Due diligence doesn't require a department "to succeed in its efforts or exhaust every possible option in attempting to do so." *Id.* at ¶ 58.

¶ 26 Whether the Department has satisfied its due diligence obligation is ultimately left to the sound discretion of the juvenile court because a due diligence finding "necessarily requires the court to make credibility determinations regarding the source of the information and the basis for the source's knowledge." *Id.*

## B. Additional Background

¶ 27 The Department's motion for temporary custody included an assertion that "the family believes there may be affiliation with the Sioux Tribe." Father repeatedly denied that the children had any Native American heritage or that ICWA would apply to the proceedings and filed a declaration of non-Indian heritage with the

10

court. Mother never participated in the dependency and neglect proceedings. No party asserted Native American heritage during the proceedings. The juvenile court found that ICWA didn't apply.

¶ 28    The Department requested, and this court granted, a limited remand of this appeal "for further proceeding[s] to exercise due diligence related to the ICWA inquiry of mother, or mother's family, pursuant to [section] 19-1-126(3)."

¶ 29    On remand, the juvenile court held several hearings to address the Department's due diligence efforts required under section 19-1-126(3). The Department reported that it was unsure where the "note about ICWA" contained in the initial proceeding came from. Still, the Department reported that it reached out to the maternal grandmother who responded by text message that her grandmother was "Sue [sic] Indian from Texas." The Department requested more information about this family member, but the maternal grandmother didn't respond. The youths reported that "they were told that they were part of a Native American tribe" but didn't have any other information to provide to the court.

¶ 30    Although it may not have been required to do so, the Department sent notice of the proceedings to the recognized Sioux

tribes using the limited relevant information they were able to gather from the maternal grandmother. *See id.* at ¶ 51 (disagreeing that due diligence requires formal notice in every case where a child may be an Indian child). The Department then followed up with the Sioux tribes that didn't respond to the notices.

### C.     Analysis

¶ 31     On remand, the juvenile court found that the Department (1) "made continuing inquiries to determine whether [the youths] are Indian children"; (2) "made efforts to contact Respondent Mother's Family to inquire about Indian heritage"; (3) sent notices to thirteen Sioux tribes, the Bureau of Indian Affairs, and the Department of the Interior; (4) received responses from most tribes that the youths weren't enrolled and weren't eligible for enrollment; and (5) followed up with the tribes that didn't respond. As a result, the court found there was no reason to know that youths were Indian children and therefore, ICWA didn't apply.

¶ 32     The juvenile court did not make any express due diligence findings, despite the Department requesting a limited remand specifically to obtain them.

12

¶ 33    In any event, the Department exercised clearly adequate due diligence by communicating with the maternal grandmother and then sending formal notice and communicating directly with each of the tribes encompassed by the maternal grandmother's general claim of Sioux heritage.  *See id.* at ¶¶ 51, 55.

¶ 34    Father claims that the Department failed to comply with the due diligence requirements because it didn't send formal notice to non-Sioux tribes in Texas or include the date and place of birth of the possible tribal ancestor on the notices it sent.  But father doesn't explain how these notice requirements under ICWA regulations applied to this case where there was no reason to know that the youths were Indian children.  *See id.* at ¶ 65.

¶ 35    Father also contends that the Department should have followed up with the youths after they reported they were part of a tribe.  Father doesn't explain, and we can't discern, what additional information may have materialized from an off-the-record conversation between the Department caseworker and the youths.

¶ 36    In any event, any error in the juvenile court's failure to make explicit due diligence findings during the proceedings held on limited remand is harmless because, as in *H.J.B.*, "we now know,

definitively" that the youths are not Indian children under ICWA. *Id.* at ¶ 64. No party has claimed, at any point in these proceedings, that either the youths, mother, or father were members or eligible for membership in an Indian tribe. *See id.* at ¶ 65. And under such circumstances, there is no reason to know or believe that the youth are Indian children. *Id.*

## IV. Reasonable Efforts

¶ 37 Father next contends that the Department failed to make reasonable efforts to rehabilitate him and reunify him with the youths. We aren't persuaded.

### A. Relevant Law and Standard of Review

¶ 38 Before a court may terminate parental rights under section 19-3-604(1)(c), C.R.S. 2024, the county department of human services must make reasonable efforts to rehabilitate parents and reunite families. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024. Reasonable efforts means the "exercise of diligence and care . . . for children and youth who are in foster care or out-of-home placement." § 19-1-103(114).

¶ 39 If adequate services are provided in accordance with section 19-3-208, the reasonable efforts standard is satisfied. § 19-1-

103(114). Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b).

¶ 40 The juvenile court should consider whether the provided services were appropriate to support the parent's treatment plan. *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). The parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

¶ 41 Whether a department satisfied its obligation to make reasonable efforts to reunify the family is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings related to reasonable efforts for clear error but review de novo the court's legal determination, based on those findings, as to whether a department satisfied its reasonable efforts obligation. *Id.*

## B. Mental Health and Substance Abuse Treatment

¶ 42     First, father contends that the Department failed to make reasonable efforts because it didn't make any referrals for him to mental health or substance abuse services. We determine that father waived this issue and therefore, we discern no basis for reversal.

¶ 43     The juvenile court found that the Department made reasonable efforts, "but father . . . lied to the caseworker. He told her that he was in treatment, that he was complying with his treatment plan, and he did not need any additional resources." The court reasoned that "parents, ultimately, are responsible for completing their treatment plan. Father [i]s responsible to be honest, and to let the caseworker know if he needs assistance. If he is dishonest, if he is purposefully deceitful and consistently turns down any offers for assistance by the caseworker, . . . [h]ow could she possibly do more when he is just bold face lying to her?"

¶ 44     The record supports the juvenile court's findings. When the case opened in December 2021, father told the Department he was "awaiting a treatment program in South Carolina." Father represented to the Department that he had been attending an

16

intensive outpatient program that included parenting classes in September 2022. However, shortly after making that representation, father was incarcerated in a different county jail, from approximately October 2022 until March 2023. Father reported attending an inpatient rehabilitation center directly after his release from the county jail, followed by an extended stay with a sober living home beginning in April 2023. Father's counsel reported that father had successfully discharged from the sober living program and continued to participate in outpatient services with that same provider. But when the caseworker followed up with the provider in the month between her conversation with father and the termination hearing, the provider reported that father was only engaged with them for one week in April 2023 and didn't successfully complete any services.

¶ 45    Waiver is the intentional relinquishment of known right. *People v. Rediger*, 2018 CO 32, ¶ 39. When a party waives an issue below, we won't review it on appeal. *Id.* at ¶ 40.

¶ 46    The record makes clear that father consistently asserted that he was engaged in the substance abuse and mental health services required by his treatment plan. The caseworker testified that, had

17

father reported that he wasn't engaged in services, the Department would have made appropriate referrals for him. Father may not now claim that the caseworker's reliance on his statements about substance abuse and mental health treatment constituted a lack of reasonable efforts by the Department. This argument was waived, and we therefore don't address its merits.

### C.    The Relationship Between Father and the Youths

¶ 47    Father next contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate him because it didn't make referrals for therapeutic services to rebuild the relationship between him and the youths or "make any plans for any type of remediation for Father's strained relationship with his children."

¶ 48    The juvenile court noted that the Department made efforts to facilitate contact between father and the youths but "father was inappropriate" during that contact and "has not been willing or able" to participate in reunification therapy.

¶ 49    The services listed in section 19-3-208(2)(b) "must be available and provided, as determined necessary and appropriate by individual case plans." § 19-3-208(2)(b). Father's case plan

18

required him to participate in an assessment to determine what level of supervision would be appropriate, and to consistently participate in family time with the youths. It's unclear if a referral for the assessment was made or if father participated in one. It doesn't appear from the record before us that father's family time was ever restricted by the court or the Department as a result of an assessment or otherwise.

¶ 50 At the time the petition was filed, father hadn't been involved in the youths' lives for about a year. The testimony at the termination hearing suggested that the Department made referrals for facilitated family time at the beginning of the case. The caseworker also facilitated some phone calls between father and the youths. Additional contact with both parents was independently initiated by the youths, who were fifteen and thirteen years old by the time the termination motion was filed. However, the caseworker testified that this contact "ended poorly," the youths decided to stop reaching out to father, and "regular, consistent phone calls did not continue to happen."

¶ 51 At the termination hearing, father's expert in reasonable efforts opined that the Department should have provided

reunification therapy to father. But the expert agreed that reunification therapy wasn't included in father's treatment plan, although the court could have ordered it had it been presented with that request and found that such therapy would have been helpful to the family. And father's expert agreed that, although the youths had been engaged in individual mental health treatment facilitated by the Department, there was no documentation that father completed any individual therapy to facilitate successful participation in reunification therapy.

¶ 52 Instead, the caseworker testified, father didn't take any accountability for the abuse that the youths suffered while they were in his care or provide any indication that he would be an appropriate candidate for reunification therapy. And, in any event, when the caseworker tried to discuss services with father the month before the termination hearing, father reported he was "not in a good place" to work on the components of his treatment plan.

¶ 53 Taken together, the testimony at the termination hearing reveals that, although father now contends that the Department should have provided more supportive services for contact with the youths, father never asked the juvenile court to determine if a

restriction of his family time or more supportive services was appropriate or necessary under his case plan. And father appeared unwilling to engage in additional services to support reunification. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12 (the juvenile court may consider a parent's unwillingness to participate in treatment when determining whether a department made reasonable efforts). We therefore discern no error in the juvenile court's findings or conclusions regarding reasonable efforts.

## D. Contact with the Department

¶ 54 Finally, father contends that the juvenile court erred by finding that the Department made reasonable efforts because, over the course of the case, it "only reached out to [f]ather on five occasions." We aren't persuaded.

¶ 55 The juvenile court considered and rejected father's specific contention that the Department should have established contact with him more often. The court found, with record support, that it was father who failed to maintain contact with the Department. The caseworker testified that it was difficult to maintain contact with father because he was in and out of jail and the hospital. Father's expert testified that her review of documentation revealed

21

that the Department set up a "contact schedule" with father for calls every ten to fourteen days and then reached out to father's mother, with whom he sometimes lived, when he stopped responding to the Department's outreach attempts.

¶ 56 Nothing in section 19-3-208 requires the Department to make or even attempt monthly contacts to satisfy its reasonable efforts obligations. And father provides no legal authority to support his claim that a caseworker's inability to maintain monthly contact violates the Department's reasonable efforts obligations.

## V. Father's Other Contentions

¶ 57 Next, father contends that his custodial status, his time in inpatient treatment centers, and a brief hospitalization prevented him from having "an adequate and fair opportunity to comply" with the treatment plan. But father didn't present this claim to the juvenile court and doesn't develop it here beyond a mere assertion. We therefore decline to address it. *See People in Interest of T.E.R.*, 2013 COA 73, ¶ 30 (generally, issues not raised in the trial court will not be considered on appeal); *see also People in Interest of R.J.B.*, 2021 COA 4, ¶ 35 (we will not consider claims that are "merely a bald assertion without argument or development").

22

¶ 58 Father concludes with a reference to the less drastic alternative of an allocation of parental responsibilities (APR). He asserts that (1) the placement providers for both of the youths were "open to APR" and (2) the paternal grandmother was willing to be a placement provider and was "also open to APR." Father doesn't provide any law or argument related to these assertions. We therefore decline to review either the juvenile court's finding that "[a]t this point in their life, after all of the abuse and neglect that they have been through, [the youths] absolutely need, and they absolutely deserve, permanency and stability, neither of which they had with either parent" or the court's determination that it considered and ruled out the less drastic alternatives presented. *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (where an appellant does not identify supporting facts, make specific arguments, or set forth specific authorities to support a contention, the contention is not properly before the appellate court and will not be addressed).

## VI. Disposition

¶ 59 The judgment is affirmed.

JUDGE KUHN and JUDGE SCHUTZ concur.